**THE UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

---

CARLA ST. MARTIN,

    Plaintiff,

       v.

WEST WINDSOR TOWNSHIP POLICE
DEPARTMENT and PTL. A. ROBLES,

    Defendants.

---

Civil Action No. 19-9300 (RK) (TJB)

**OPINION**

**KIRSCH, District Judge**

    **THIS MATTER** comes before the Court upon a Motion for Summary Judgment filed by Defendants Alfonso Robles ("Robles) and the West Windsor Township Police Department (the "Department") (together "Defendants"), seeking dismissal on all of Plaintiff Carla St. Martin's ("Plaintiff" or "St. Martin") claims. (ECF No. 67.)[1] The Court has reviewed Defendants' moving brief, ("Defs.' Br.", ECF No. 67-8), Plaintiff's opposition brief, ("Pl.'s Br.", ECF No. 68-6), and Defendants' reply brief, ("Defs.' Reply", ECF No. 69-3). The Court has also received and carefully reviewed Defendants' Statement of Facts, ("Defs.' SOF", ECF No. 67-1), Plaintiff's Counter-Statement of Facts, ("Pl.'s C-SOF", ECF No. 68), Plaintiff's Supplemental Statement of Facts, ("Pl.'s S-SOF", ECF No. 68-1), Defendants' Reply Statement of Facts, (ECF No. 69), and the exhibits submitted along with them.

---

[1] Pursuant to the Court's Order, the parties served their summary judgment briefs on each other and filed the fully-briefed motion on the docket once complete. (ECF No. 52.) Defendants originally served their notice of motion and moving brief on Plaintiff on March 2, 2022. The parties requested multiple extensions on their subsequent briefing, Plaintiff served her opposition brief on November 18, 2022, (ECF No. 68), and Defendants served their reply brief on May 1, 2023, (ECF No. 69). Thereafter, the matter was transferred to the Undersigned. (ECF No. 73.)

The Court has considered the parties' submissions and resolves the matter without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1. For the reasons set forth below, Defendants' Motion for Summary Judgment is **GRANTED** and Plaintiff's Amended Complaint, (ECF No. 21), is **DISMISSED**.

## I.    BACKGROUND

This matter arises from a traffic stop conducted by Robles, a police officer employed by the Department, of a vehicle in which St. Martin was a passenger. St. Martin, who was permitted to legally possess and use marijuana pursuant to New Jersey's Compassionate Use Medical Marijuana Act, had several bags of raw marijuana with her at the time of the stop. Robles, unable to confirm that the marijuana was legally-dispensed during the traffic stop, confiscated it. The following day, after learning through the state registry that not all of the confiscated marijuana had been legally dispensed, Robles issued a summons complaint against St. Martin. St. Martin was never detained, arraigned, or otherwise held, and the charge was eventually dismissed when the prosecutor determined the marijuana was lawfully possessed. St. Martin then initiated this civil rights action against Robles and the Department.

### A.    NEW JERSEY COMPASSIONATE USE MEDICAL MARIJUANA ACT

On October 1, 2010, New Jersey enacted the Compassionate Use Medical Marijuana Act ("CUMMA"), N.J. Stat. Ann. §§ 24:6I-1 to -16. CUMMA "decriminalized the use of medical marijuana for 'any qualifying patient, primary caregiver, alternative treatment center, physician, or any other person acting in accordance with' its terms." *Wild v. Carriage Funeral Holdings, Inc.*, 227 A.3d 1206, 1208 (N.J. 2020) (quoting N.J. Stat. Ann. § 24:6I-6(a)). CUMMA sets out specific medical conditions which marijuana may be used to treat and orders the establishment of a registry

of qualifying patients to whom registry identification cards will be issued. *See Caporusso v. New Jersey Dep't of Health & Senior Servs.*, 82 A.3d 290, 293 (N.J. Super. Ct. App. Div. 2014).

If a patient acquires and uses marijuana as authorized by CUMMA, she is "exempt[] from criminal liability under" New Jersey's controlled dangerous substances ("CDS") laws. N.J. Stat. Ann. § 2C:35-18(a). Thus, CUMMA establishes "an affirmative defense to any criminal action arising under [New Jersey CDS laws] that the defendant is the authorized holder of an appropriate registration, permit, order form or is otherwise exempted or excepted from criminal liability by virtue of any provision of [CUMMA]." N.J. Stat. Ann. § 2C:35-18(a). In a criminal action, the defendant bears the burden of establishing this affirmative defense by a preponderance of the evidence. *Id.* The same provision states that "[n]o liability shall be imposed by virtue of this chapter or chapter 36 upon any duly authorized State officer, engaged in the enforcement of any law or municipal ordinance relating to [CDS] or [CDS] analogs." *Id.* at § 2C:35-18(b).

After CUMMA's passage, the New Jersey Office of the Attorney General promulgated a 40-page document entitled "Medical Marijuana Enforcement Guidelines for Police," dated December 6, 2012. ("Guidelines", Ex. 9 to Cert. of Willian F. Joseph ("Joseph Cert."), ECF No. 68-3.) The preface states that "[i]t is reasonable to expect that the distinctive odor of raw or burning marijuana may attract law enforcement attention to the vehicular transport and out-of-home use of lawfully-dispensed medical marijuana," and that it is therefore "important for police officers . . . to be able to distinguish the lawful use and possession of medical marijuana in accordance with CUMMA from the unlawful use and possession of this [CDS]." (*Id.* at 1.) However, it cautions that the Guidelines "do not vest enforcement rights in any person" and should not be "construed or applied to invalidate an investigative detention, arrest, search, seizure, or charge that is made in accordance with applicable State law." (*Id.* at 1 n.1.)

Section 1.5 of the Guidelines describes procedures for an officer to verify a person's registration status under CUMMA. (*Id.* at 7–8.) A police officer may call the State Police Regional Operations Intelligence Center ("ROIC"), which has "secure access on a 24/7 basis to selected pieces of information from a database maintained by the [New Jersey] Department of Health Medicinal Marijuana Program [("NJMMP")]." (*Id.* at 7.) Contacting the ROIC will provide an officer the name, date of birth, address, and "registry identification number" of any qualifying patient and the Alternative Treatment Center ("ATC") authorized to dispense to the patient. (*Id.*)

Generally under CUMMA, an authorized ATC may only dispense two or fewer ounces of marijuana at one time, and no patient may be lawfully dispensed more than two ounces within a thirty-day period. (*Id.* at 14 (citing N.J. Stat. Ann. § 24:6I-10).) "However, the statute does NOT impose a limit on the total amount of medical marijuana that the patient . . . may possess at any given time." (*Id.*) A person may only possess marijuana product "that has been lawfully dispensed to the qualifying patient . . . by a[n] [ATC] to which the person is registered." (*Id.* at 15.) If an officer has "articulable and specific reasons to believe" otherwise, "the officer should proceed as if the affirmative defense does not apply. . . ." (*Id.*) Section 2.5 notes that CUMMA "only authorizes *simple* possession and *personal use* of the lawfully-dispensed medical marijuana. It does NOT authorize a patient to share or in any other way distribute medical marijuana to any other person." (*Id.* at 13 (emphasis in original).)[2]

A registered CUMMA patient is issued a NJMMP registry identification card ("MMPC"). (*Id.* at 18.) ATCs only dispense marijuana in heat-sealed packages that hold less than ¼ ounce of marijuana. (*Id.* at 19.) While a patient is not required to keep their prescribed marijuana in its

---

[2] Section 3.1 cautions that an officer may not make inculpatory assumptions based solely on a suspect's CUMMA registration status. (Guidelines at 16.) However, the Guidelines also make plain that they do not "limit the authority and discretion of an officer to investigate a possible marijuana possession offense based on facts or circumstances other than the person's registration status . . . ." (*Id.* at 17.)

original packaging in order to claim the affirmative defense, "failure to do so is a relevant factor that an officer may consider in determining whether the person's possession of marijuana is lawful." (*Id.* at 19–20.) ATCs likewise affix a label on each dispensed package with required information, and the Guidelines warn that "the removal or alteration of a dispensing label is a relevant factor" an investigating officer should consider. (*Id.* at 20.)

Section 2.1 of the Guidelines reiterates that the responsibility for asserting the affirmative defense under CUMMA is on the qualified patient. (*Id.* at 8.) While an officer may choose to proactively inquire whether a person suspected of possessing marijuana is a qualified user, a CUMMA patient is not automatically required to "make vehicle-borne medical marijuana available for law enforcement inspection." (*Id.* at 9.) Section 4.1 instructs that an officer "should, when practicable, try to verify or dispel the person's claim by contacting the ROIC before making an arrest, filing charges, or seizing marijuana in any situation where the officer would not have" otherwise done so. (*Id.* at 19.) The Guidelines continue, however, noting that:

> [B]ecause a person asserting the CUMMA affirmative defense ultimately bears the burden of proof . . . , in the event that a person exercises . . . his or her constitutional right to refuse a consent search that would enable the officer to visually inspect the marijuana, the officer may in the exercise of his or her discretion proceed as if the affirmative defense does not apply or has not been proved, and may leave ultimate resolution of the applicability of the affirmative defense to the prosecutor and/or the court.

(*Id.*) A later section on search and seizure issues that may be implicated in CUMMA's application provides:

> [W]hen an officer develops reasonable articulable suspicion or probable cause to believe that a marijuana offense is being or has been committed (e.g., a plain view observation or "plain smell" of marijuana), that reasonable articulable suspicion or probable cause does not dissipate merely because a suspect asserts that the detected marijuana is medical marijuana possessed in accordance with CUMMA. . . . Rather, an officer continues to have reasonable

> articulable suspicion or probable cause for purposes of conducting a criminal investigation unless and until the officer is reasonably satisfied from the on-scene investigation that the CUMMA affirmative defense is applicable. ... Any such on-scene investigation need not be limited to verifying that a person is registered with the Medicinal Marijuana Program, since a registered qualifying patient or primary caregiver may engage in marijuana-related conduct that falls outside the CUMMA exemption from criminal liability. . . . An officer may therefore choose to make the determination of the applicability of the CUMMA affirmative defense after having an opportunity to visually inspect the medical marijuana to confirm that it is being possessed in compliance with CUMMA (e.g., that the information on the dispensing label matches the suspect's registry identification number, the total amount of marijuana in consistent with CUMMA compliance and does not suggest distribution or possession with intent to distribute, etc.).

(*Id.* at 23–24.) The Guidelines list a number of non-dispositive factors that an officer may consider in determining whether the affirmative defense applies. (*See id.* at 21–22.)

## B.    APRIL 16 VEHICLE STOP AND SEARCH [3]

Officer Alfonso Robles was on patrol in West Windsor Township, New Jersey on the morning of April 16, 2017. (Pl.'s C-SOF ¶ 2.) At 8:43 a.m. that morning, Robles conducted a random license plate inquiry of a black BMW, which was registered to Tyshnn Jackson ("Jackson"). (*Id.* ¶¶ 3–4.) The BMW's vehicle registration was expired, so Robles stopped the vehicle. (*Id.* ¶¶ 8–9.) Jackson was driving, and his then-spouse, St. Martin, sat in the front passenger seat. (*Id.* ¶¶ 5–6.)

Robles testified that as he approached the vehicle, he detected a "strong odor of raw marijuana coming from the car," which became "extreme" as he reached the open passenger-side window. (*Id.* ¶¶ 11–12.)[4] Jackson presented Robles with an expired vehicle registration card and

---

[3] The parties disagree over the extent to which the relevant interactions during the traffic stop were captured by the officers' body-worn and dashboard cameras. (Defs.' SOF ¶¶ 14–15; Pl.'s C-SOF ¶¶ 14–15.)

[4] For some statements provided in Defendants' Statement of Facts, such as facts that come from Robles's deposition testimony, St. Martin only admits that Robles so testified without admitting the truth of the claim. (*See, e.g.,* Pl.'s C-SOF ¶¶ 11–12.) However, St. Martin does not cite any facts from the record

did not provide valid proof of insurance. (Pl.'s S-SOF ¶ 24–25.) Robles asked Jackson to step out of the vehicle to speak on the side of the road, and Jackson complied. (*Id.* ¶ 25.) After Jackson exited the vehicle, Robles told him that Robles smelled marijuana from the vehicle, and Jackson confirmed there was. (*Id.* ¶¶ 30–32.) Jackson also informed Robles that St. Martin possessed a medical marijuana card and that the marijuana she had was prescribed. (Pl.'s C-SOF ¶¶ 17–18.)[5] Jackson told Robles that he (Jackson) was not a medical marijuana patient. (*Id.* ¶ 19.) Robles searched Jackson and St. Martin for the source of the raw marijuana odor. (*Id.* ¶ 17.)

At that point, Robles informed Jackson that he was going to search the vehicle. (*Id.* ¶ 23.) Before conducting the search, Robles requested that St. Martin exit the vehicle, and she did so without objection. (*Id.* ¶ 24.) Before she exited the vehicle, St. Martin showed Robles her medical marijuana card ("MMPC") issued by the NJMMP. (*Id.*) Robles had never seen an MMPC before and did not recognize it. (*Id.* ¶ 25.) The two other officers who had arrived on scene had also never seen an MMPC before and did not recognize it either. (*Id.*) Robles photographed the card. (*Id.* ¶ 26.) Officer Latham ("Latham"), another officer on scene, called the phone number printed on the card, which was for the NJMMP, in an attempt to verify St. Martin's status as a qualified patient. (*Id.* ¶¶ 28–29.) It was Easter Sunday, and Latham's call to the NJMMP went unanswered. (*Id.* ¶¶ 28, 30.) Robles conducted a Google search about CUMMA during the traffic stop of

---

contradicting these statements. Given St. Martin's failure to cite any evidence supporting her caveated response, the Court will "consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e)(2).

[5] Robles testified that Jackson informed him that Jackson and St. Martin had "smoked a little joint" earlier that morning and that St. Martin had shared her marijuana with him previously. (Pl.'s C-SOF ¶¶ 20–21.) St. Martin agrees that she smoked that morning, but denies knowing whether Jackson smoked that morning, knowing whether Jackson ever ingested marijuana during the six years they resided together, and ever sharing her prescribed marijuana with Jackson. (*Id.*) In his certification, Jackson also denies having told Robles that he consumed marijuana that day. (Cert. of Tyshnn Jackson ¶ 16, Ex. 7 to Joseph Cert., ECF No. 68-2.) Viewing the evidence in the light most favorable to St. Martin, the Court assumes that Jackson did not inform Robles that he had ingested marijuana the day of the traffic stop. In so doing, for purposes of the subject Motion only, the Court is not making any credibility finding relating to Robles.

Jackson and St. Martin because he could not reach the phone number on the card. (Pl.'s S-SOF ¶¶ 176–79.) Robles's Google search produced examples of authentic MMPCs, which, along with other indicia of reliability about the card, led Robles to believe that St. Martin's MMPC was authentic. (*Id.* ¶¶ 179–87.)

Robles proceeded to search the vehicle. During the search, Robles claimed the smell of marijuana was "pervasive throughout the entire interior." (Pl.'s C-SOF ¶ 31.) Robles found no marijuana unsecured in the vehicle. Robles then searched a handbag located in the front passenger area of the vehicle. (*Id.* ¶ 32.) Robles's search of the handbag turned up two small plastic containers and one black shopping bag, which itself contained four vacuum sealed plastic food storage bags. (*Id.* ¶¶ 32, 37.) The two plastic containers had labels that appeared to be issued from a medical marijuana dispensary, and included St. Martin's name, ID number, and the name "Garden State Dispensary." (*Id.* ¶ 33.) Each plastic container was labeled 3.5 grams. (*Id.* ¶ 34.) The plastic containers bore labels "Flo"—containing a trace amount of powder—and "Shake (High Potency)"—which was empty. (*Id.* ¶¶ 32, 35–36.) Robles opened the "Flo" container, sniffed it, and confirmed it was marijuana. (*Id.* ¶ 36.) Robles returned the two plastic containers to St. Martin because he did not have any reason to believe that the containers did not contain prescribed marijuana. (*Id.* ¶¶ 36, 65.)

Four plastic food storage bags Robles found in the black shopping bag in the handbag in the car contained what appeared to Robles to be "raw marijuana." (*Id.* ¶ 37.) Two of the four bags were hand-labeled with black permanent marker as "GC," and the other two were labeled "Master Kush" and "MK." (*Id.* ¶ 38; *see also* Ex. A to Cert. of Alfonso Robles ("Robles Cert."), ECF No.

67-5.)[6] St. Martin was the person who put the raw marijuana in the four bags and wrote the strain names in marker. (Pl.'s C-SOF ¶ 40.) The plastic bags did not contain any labels with St. Martin's information suggesting the marijuana had been issued by a licensed dispensary or to St. Martin specifically. (*Id.* ¶ 41.) Robles believed that prescription drugs had to be transported in their original packaging and told St. Martin the same; Robles also advised St. Martin that the marijuana in the four bags appeared to be contraband. (*Id.* ¶¶ 42–45.)[7] Robles believed that the marijuana from the four bags could not have fit in the two plastic containers. (*Id.* ¶ 46.) After removing the marijuana found in the handbag from the car, Robles could still smell marijuana. (*Id.* ¶ 48.) Robles searched the vehicle's trunk and did not find any more marijuana. (*Id.* ¶ 50.)

Robles confiscated the marijuana recovered in the four plastic bags because it was not in the original packaging provided by a licensed dispensary. (*Id.* ¶¶ 65, 66.) Robles informed St. Martin if he determined that the marijuana was possessed unlawfully, he would contact her and charge her with unlawful possession of a CDS. (*Id.* ¶ 68.) Robles issued two traffic summonses to Jackson for driving an unregistered vehicle and failure to exhibit insurance documents. (*Id.* ¶¶ 69–70.) The entire vehicle stop lasted one hour ten minutes, from 8:43 a.m. to 9:53 a.m. (*Id.* ¶ 72.) Of that time, Robles spent nine minutes writing out traffic summonses to Jackson and fourteen minutes searching the vehicle. (*Id.* ¶¶ 49, 51, 71.)

---

[6] Robles certifies that one of the bags was "torn open." (Pl.'s C-SOF ¶ 39; Ex. A to Robles Cert.) St. Martin points to the photos of the bags and contends that neither appears to be torn or open. (Pl.'s C-SOF ¶ 39; Exs. I & J to Robles Cert.)

[7] St. Martin denies these statements or caveats her responses, pointing to evidence supporting her argument that Robles was inadequately trained on the Guidelines. These are arguments not contradictory evidence, and the Court therefore treats Defendants' assertions of fact as admitted. *See* Fed. R. Civ. P. 56(e).

C.    APRIL 17 INVESTIGATION AND COMPLAINT

The following day, Monday April 17, 2017, Robles attempted to confirm that St. Martin lawfully possessed the raw marijuana recovered from the four plastic bags. (*Id.* ¶ 74.) Robles was assisted by Detective Van Ness ("Van Ness"). (*Id.* ¶ 75.) Robles informed Van Ness about the events of the traffic stop the preceding morning. (*Id.* ¶¶ 77–84.) With Robles present, Van Ness contacted the NJMMP by calling the number on the back of St. Martin's card—the same number Officer Latham had dialed the previous day, which the card stated should be called "for information." (*Id.* ¶¶ 76, 85.) Van Ness followed prompts for inquiries by law enforcement to obtain medical marijuana patient information. (*Id.* ¶¶ 86–87.) Van Ness was connected with a NJMMP representative, who took down his law enforcement information and advised that someone would contact him once the information was verified. (*Id.* ¶¶ 88–89.)

Later that day, Van Ness received a call from an NJMMP representative identified as "Takia," who confirmed that St. Martin was a qualified patient and was issued an MMPC on March 27, 2017. (*Id.* ¶¶ 90–91.)[8] Takia advised Van Ness that she had a record of all of St. Martin's medical marijuana purchases and that St. Martin was permitted to purchase up to two ounces of marijuana each thirty-day period. (*Id.* ¶¶ 92–93.) Takia further informed Van Ness that as of April 17, 2017, St. Martin had only filled one prescription for 3/8 ounce of marijuana on April 14, 2017, and that she could not legally possess any marijuana beyond any amount filled through her

---

[8] St. Martin neither admits nor denies the information relayed to Van Ness from the NJMMP representative, as she was not present for the call. (Pl.'s C-SOF ¶¶ 85–97.) St. Martin complains that Defendants did not record Takia's last name or provide it during discovery. (*Id.* ¶ 90.) St. Martin further complains that Takia's "authority is questionable" and "her affiliation is unsettled." (*Id.* ¶ 90.) From the record provided, it does not appear that St. Martin deposed Van Ness or conducted discovery into Takia's identity.

prescription. (*Id.* ¶¶ 94–95.)[9] Takia said she was unable to release documentation to the officer without a subpoena. (Pl.'s S-SOF ¶ 220.)

Robles weighed the four bags of marijuana at the police station and found that they weighed approximately 19 grams each, and therefore approximately 76 grams total. (Pl.'s C-SOF ¶¶ 98–99.)[10] Robles then completed evidence submission forms for the marijuana to be tested by the state forensic laboratory, which measured the marijuana in the bags as totaling approximately 53 grams. (*Id.* ¶ 100.)[11] Robles searched the website of the Garden State Dispensary ("GSD"), St. Martin's authorized dispensary, for the strains hand-written on the four plastic bags. (*Id.* ¶ 101.) Robles's search for "Master Kush" and "MK" did not produce any results. (*Id.* ¶ 102.)

Robles called St. Martin and asked when she filled her prescription for two ounces from the GSD. (*Id.* ¶ 104.) St. Martin told Robles about all of her purchase dates from March 31 to April 14, 2017 (totaling 2 3/8 ounces). (*Id.* ¶¶ 95, 105.) Robles said that St. Martin told him she would

---

[9] St. Martin contends that the information Takia relayed to Van Ness is incorrect. St. Martin explains that her 30-day cycles as a CUMMA patient began on March 9, 2017, when she was first *approved* for the CUMMA program, and that Takia did not convey the entire history of her authorized purchases. (Pl.'s C-SOF ¶ 91.) With her summary judgment opposition, St. Martin submits documentation showing that the total amount of marijuana she was permitted to legally purchase by April 16 was four ounces (covering two 30-day cycles), and the total amount of marijuana she had actually purchased by then was 2 3/8 ounces. (*Id.* ¶¶ 91, 95; *see also* Exs. 14–18 to Joseph Cert., ECF No. 68-3.)

For the reasons explained below, the fact that St. Martin now offers proof regarding the lawfulness of her marijuana possession is irrelevant to Robles's probable cause determination on April 16, 2017.

[10] The Court takes judicial notice of the fact that there are approximately 28.3 grams in 1 ounce. *See* Fed. R. Evid. 201(b). Thus 76 grams is equivalent to approximately 2.7 ounces.

[11] Robles sent the suspected marijuana from the black shopping bag for testing on May 9, 2017, approximately three weeks after he recovered them during the traffic stop. (Pl.'s C-SOF ¶ 37.) On December 14, 2017, the forensics laboratory's testing confirmed that all four bags were positive for marijuana and had a combined weight of 53.387 grams. (*Id.* ¶¶ 37, 117.) The Court notes the difference between Robles's 76 gram estimate and the forensic laboratory's 53 gram precise determination. However, as explained below, what matters for Robles's probable cause determination is what he knew at the time of the arrest, not what information he subsequently learned. Further, possession of even the lesser amount— 53 grams—of marijuana constituted a criminal offense.

not be able to provide documentation supporting her statement that she had fulfilled prescriptions in the amount of marijuana recovered on April 16. (*Id.* ¶ 106.)

Eventually, Robles determined that St. Martin should be charged with unlawful possession of marijuana. (*Id.* ¶ 107.) Robles called St. Martin to advise her of this and instructed her to come to the police station to be processed and served with a complaint-summons. (*Id.* ¶ 109.) Robles prepared the charging documents before St. Martin was scheduled to arrive at the station. (*Id.* ¶¶ 108–10.) St. Martin arrived at the station at approximately 3:20 p.m. on April 17, 2017. (*Id.* ¶ 111.) St. Martin was at the station for approximately two hours. (*Id.* ¶ 112.)[12] While at the station, St. Martin did not present any documentation confirming the quantity of marijuana she had obtained from a licensed dispensary. (Defs.' SOF ¶ 114.)[13] Robles issued St. Martin a Complaint-Summons charging her with possession of greater than 50 grams of marijuana in violation of N.J. Stat. Ann. § 2C:35-10a(3). (Pl.'s C-SOF ¶ 108.)[14] St. Martin was processed and released the same day. (*Id.* ¶ 115.)

---

[12] Robles certified that St. Martin was at the station for approximately 35 minutes. (Defs.' SOF ¶ 112.)

[13] St. Martin denies this statement because she provided Robles with a document with her prescribing doctor's information. (Pl.'s C-SOF ¶¶ 106, 114.) The document, which appears to be a printout from an online NJMMP portal, shows St. Martin's information and her prescribing physician's information. (Ex. 3 to Joseph Cert., ECF No. 68-3.) The printout also shows the "Qty Suggested for Each 30 Days" as 2 ounces. (*Id.*) The document does not show St. Martin's history of how much marijuana was dispensed on each date.

[14] Robles's probable cause affidavit for the arrest states:

> Subsequent to a motor vehicle stop, the defendant was found to be in possession of approximately seventy-six grams of suspected raw marijuana packaged into four unmarked vacuum sealed bags located inside of a black shopping bag concealed in her personal handbag. The defendant is a [NJMMP] patient but did not have a prescription for the suspected raw marijuana. The four vacuum sealed packages did not contain prescription labels or branding identifying it as being a prescribed drug.

> The suspected raw marijuana was found concealed in the defendant's personal handbag. The defendant also admitted she uses the found suspected raw marijuana to treat her illnesses.

(Ex. 12 to Joseph Cert., ECF No. 68-3.)

### D.     POST-COMPLAINT PROSECUTION

St. Martin's first appearance in Superior Court was scheduled for May 4, 2017, several days later. (*Id.* ¶ 119.) On April 24, the Mercer County Prosecutor's Office downgraded the charges against St. Martin to a disorderly persons offense under N.J. Stat. Ann. § 2C:35-10(a)(4), and remanded the case to West Windsor Municipal Court. (*Id.* ¶ 123.) St. Martin's attorney waived her first appearance, and she never appeared in court, was arraigned, or was held in connection with any charge instituted by Robles. (*Id.* ¶¶ 120–27.) St. Martin also did not have to post bail or report to any pre-trial services agency. (*Id.* ¶ 128.) On August 17, 2017, the Prosecutor's Office wrote in a letter that St. Martin had sufficient evidence to make out the CUMMA affirmative defense, and the Complaint-Summons was dismissed with prejudice on September 20. (*Id.* ¶ 129; Pl.'s S-SOF ¶ 123.)

### E.     ROBLES'S TRAINING

Robles joined the Department around spring 2016. (Pl.'s S-SOF ¶ 172.) Neither Robles nor the other two officers who responded to the scene of the traffic stop had seen an MMPC before St. Martin's. (Pl.'s C-SOF ¶ 25.) However, Robles knew that medicinal marijuana was legal in New Jersey. (Pl.'s S-SOF ¶ 23.) Robles had never read the CUMMA Guidelines before the arrest or had been directed to review or study them. (*Id.* ¶ 93; Pl.'s C-SOF ¶ 45.) Robles had never been trained on CUMMA when he first joined the Department. (Pl.'s S-SOF ¶ 173.) Robles agreed that had he been trained on CUMMA, he would have been able to verify St. Martin's MMPC faster. (Pl.'s C-SOF ¶ 45.)

The Department distributed the Guidelines in 2012 when they were published. (Pl.'s S-SOF ¶ 94.) The Department did not provide every new officer with a copy of each Attorney General guideline the Department received, including to Robles's 2016 training class. (*Id.*; Pl.'s

C-SOF ¶ 132.) The Department's representative, Lt. Danny Mohr, testified that there are many "laws, local ordinances, motor vehicle violations, Attorney General's guidelines, policies, [and] procedures" and that only the "most important" were addressed in new officer training. (Pl.'s C-SOF ¶ 133.) For guidelines that are of "lesser importance," Department employees refer to them "when questions arise." (*Id.*) Lt. Mohr testified that he is familiar with investigation and operations reports for officers in the Department and that incidents involving CUMMA "rarely occurred" during his 22 years of service and do not come up frequently during an officer's service. (*Id.* ¶ 134.) The last update to the Department's field training manual was March 2009. (Pl.'s S-SOF ¶ 174.)

Plaintiff retained an expert witness, Joseph Blaettler. ("Blaettler Rpt.", Ex. 23 to Joseph Cert., ECF No. 68-4.) Blaettler reviewed a number of documents from this litigation and opined that (1) Robles lacked probable cause supporting his decision to search and arrest St. Martin and (2) the Department's failure to train Robles and the other officers on the Guidelines constituted "deliberate indifference" supporting the imposition of liability on the Department. (*Id.* at 12–21.)

### F.    PROCEDURAL HISTORY

St. Martin filed her suit *pro se* in this Court on April 5, 2019. (ECF No. 1.) After subsequently retaining counsel, St. Martin filed her Amended Complaint on January 27, 2020. ("FAC", ECF No. 21.)

The Amended Complaint alleged five Counts. (FAC ¶¶ 56–76.) Count One alleges that Robles conducted an illegal search and seizure because he lacked probable cause to detain St. Martin, search the car and her handbag, and issue a criminal complaint against her. Count Two alleges that false arrest and imprisonment pursuant to 42 U.S.C. § 1983 under the Fourth Amendment. Count Three alleges malicious prosecution pursuant to 42 U.S.C. § 1983, based on the argument that Robles lacked reasonable belief that the marijuana St. Martin possessed was

illegally obtained when he searched the car and "failed to report" this information in writing his report of the incident. Count Four alleges a Section 1983 failure-to-train claim against the Department for deficient training regarding CUMMA. Finally, Count Five alleges a separate violation of Article I, Section 7 of the New Jersey Constitution, brought pursuant to the New Jersey Civil Rights Act ("NJCRA"), N.J. Stat. Ann. § 10:6-1 *et seq.*

## II.    LEGAL STANDARD

### A.    FEDERAL RULE OF CIVIL PROCEDURE 56

Federal Rule of Civil Procedure 56 provides that the Court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must "view[] the facts in the light most favorable to the party against whom summary judgment was entered." *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)). A "material fact" is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine dispute" about a fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The party moving for summary judgment has the initial burden of establishing its right to summary judgment. See *Celotex Corp.*, 477 U.S. at 323. To show that a material fact is not genuinely disputed, it "must . . . cit[e] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). The moving party may also meet its burden by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or

that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B). Once the movant meets this threshold burden under Rule 56, the non-moving party must present evidence to establish a genuine issue as to a material fact. *See Anderson*, 477 U.S. at 248; *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (holding that the non-movant "must do more than simply show that there is some metaphysical doubt as to material facts").

### B.    PROBABLE CAUSE DETERMINATION

The Fourth Amendment prohibits "unreasonable searches and seizures." U.S. Const. amend. IV. A search is presumptively unreasonable if carried out without a warrant issued pursuant to probable cause. *See Katz v. United States*, 389 U.S. 347, 356–357 (1967). The existence of probable cause to support a search requires a "fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Burton*, 288 F.3d 91, 103 (3d Cir. 2002) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). "[P]robable cause to arrest exists when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested." *Orsatti v. N.J. State Police*, 71 F.3d 480, 483 (3d Cir. 1995) (citations omitted). Probable cause is a "totality of the circumstances" test, *United States v. Myers*, 308 F.3d 251, 260 (3d Cir. 2002), requiring an "objective" evaluation "based on the facts available to the officers at the moment of arrest," *Quinn v. Cintron*, 629 F. App'x 397, 399 (3d Cir. 2015) (citations omitted).

"Typically, the existence of probable cause in a section 1983 action is a question of fact" most appropriately reserved for a jury. *Sherwood*, 113 F.3d at 401 (citing *Groman v. Twp. of Manalapan*, 47 F.3d 628, 635 (3d Cir. 1995)). Despite the Court's obligation at summary judgment to view facts most favorably to the non-moving party, this view of factual disagreements must

account for an officer's probable cause determination. *See Dempsey v. Bucknell Univ.*, 834 F.3d 457, 468 (3d Cir. 2016) (recognizing "a tension inherent in evaluating probable cause at the summary judgment stage" given that probable cause "allows for the existence of conflicting, even irreconcilable, evidence"). The Third Circuit explained how a judge should reconcile these standards:

> While it is axiomatic that at the summary judgment stage, we view the facts in the light most favorable to the nonmoving party, it does not follow that we exclude from the probable cause analysis unfavorable facts an officer otherwise would have been able to consider. Instead, we view all such facts and assess whether any reasonable jury could conclude that those facts, considered in their totality in the light most favorable to the nonmoving party, did not demonstrate a "fair probability" that a crime occurred. Only then would the existence of conflicting evidence rise to the level of a "genuine dispute as to any material fact" such that summary judgment would be inappropriate. Thus, where the question is one of probable cause, the summary judgment standard must tolerate conflicting evidence to the extent it is permitted by the probable cause standard.

*Id.* Courts applying the probable cause standard at summary judgment regularly grant summary judgment when probable cause "exist[s] as a matter of law." *Turkos v. Dupont Borough*, 721 F. App'x 208, 212 (3d Cir. 2018).[15]

## III.    **DISCUSSION**

St. Martin asserts a variety of constitutional claims under 42 U.S.C. § 1983 and the NJCRA. Specifically, St. Martin asserts claims against Robles for illegal search and seizure, false arrest and imprisonment, malicious prosecution, and against the Department for supervisory liability for allegedly failing to adequately train Robles.

---

[15] *See also Simonson v. Borough of Taylor*, 839 F. App'x 735, 739 (3d Cir. 2020) (affirming grant of summary judgment on section 1983 claim because probable cause existed as a matter of law); *Davison v. Sheaffer*, 820 F. App'x 167, 171 (3d Cir. 2020) (same); *Collick v. William Paterson Univ.*, No. 21-2281, 2022 WL 14002177, at *5 (3d Cir. Oct. 24, 2022) (same).

To prevail on a Section 1983 claim, a plaintiff must show the violation of a right secured by the Constitution or laws of the United States and that the alleged deprivation was committed or caused by a person acting under color of state law. *See Harvey v. Plains Twp. Police Dep't*, 635 F.3d 606, 609 (3d Cir. 2011) (citing 42 U.S.C. § 1983). Critical to St. Martin's Section 1983 claims is whether probable cause supported Robles's decision to search St. Martin and charge her for possessing marijuana the following day without taking the extra investigatory steps that St. Martin argues would have exculpated her. *See Simonson v. Borough of Taylor*, 839 F. App'x 735, 738 (3d Cir. 2020) (observing that establishing unlawful search and seizure, false arrest and imprisonment, and malicious prosecution require that an officer lacks probable cause).[16]

### A.    COUNT ONE – ILLEGAL SEARCH AND SEIZURE

Count One alleges that Robles conducted an illegal search and seizure because he lacked probable cause to: "(a) detain [St. Martin]; (b) conduct a warrantless search of the car in which she was a passenger; (c) search the contents of her pocketbook; and (d) subsequently issue a criminal complaint." (FAC ¶ 58.) The Court's analysis of Count One's Fourth Amendment challenge to the criminal complaint's issuance is identical to its analysis of Count Two's Fourth Amendment false arrest and imprisonment claims; therefore, those claims are addressed together in the following section. For now, the Court considers (1) Robles's search of the vehicle and St. Martin's handbag and then (2) St. Martin's purported seizure while Robles conducted the search.

---

[16] *See also Dempsey*, 834 F.3d at 479 (affirming district court's grant of summary judgment dismissing section 1983 claims because "no reasonable jury could determine that the affidavit lacked probable cause"); *Collick*, 2022 WL 14002177, at *3 (noting that the district court's probable cause analysis was "dispositive of all claims dismissed . . . at summary judgment"); *Wildoner v. Borough of Ramsey*, 744 A.2d 1146, 1154 (N.J. 2000) ("[P]robable cause is an absolute defense to Plaintiff's false arrest, false imprisonment, and malicious prosecution claims, and his Section 1983 claims . . . .").

### 1.     Search of Plaintiff's Vehicle and Handbag

St. Martin contends that Robles conducted two illegal searches—of the car and then her handbag—during the April 16, 2017 traffic stop. (Pl.'s Br. at 12–20.)[17] According to St. Martin, probable cause did not support either search because she presented Robles with her MMPC before the search, triggering the protections of CUMMA's affirmative defense. (*Id.* at 15.) In light of CUMMA's applicability, the fact that Robles knew there was marijuana in the vehicle did not create probable cause justifying searching for it. (*Id.* at 17.) St. Martin further contends that no exception to the Constitution's warrant requirement permitted Robles's warrantless search. (*Id.* at 14–15, 19–20.) St. Martin also argues that Robles failed to follow the Guidelines during the search, further undermining his probable cause determination. (*Id.* at 3, 16.)

Defendants contend that the "plain smell" doctrine created probable cause for the search. (Defs.' Br. at 12.) They argue that once Robles smelled the marijuana, he was permitted (and even required by his duty) to find the marijuana to determine whether it was legally possessed under CUMMA. (*Id.* at 6, 9, 10.) Defendants posit that the automobile exception to the warrant requirement applies here because the probable cause for the search was unforeseeable and spontaneous. (*Id.* at 12–13.) Defendants conclude that the procedures set out in the Guidelines do not affect the probable cause analysis but that in any event, Robles followed the Guidelines in interacting with St. Martin. (*Id.* at 10–11.)

Here, it is uncontested that at the time he conducted his search of the vehicle, Robles knew marijuana was present in the car. As Robles approached the vehicle, he detected a "strong" and

---

[17] Generally, passenger in a vehicle lacks standing to challenge the constitutionality of the vehicle's search. *See United States v. Shabazz*, 533 F. App'x 158, 162 (3d Cir. 2013) (affirming district court's denial of a defendant passenger's suppression motion because the defendant "had no reasonable expectation of privacy in the vehicle"). However, Defendants do not raise St. Martin's standing to challenge the vehicle's search—presumably because she has an ownership or possessory interest in the vehicle—and therefore the Court does not address it.

"extreme" odor of raw marijuana from the open passenger-side window. (Pl.'s C-SOF ¶¶ 11–12.) Jackson then confirmed to Robles that there was marijuana in the vehicle. (*Id.* ¶¶ 17–18.) Robles searched Jackson and St. Martin for the source of the raw marijuana odor, (*id.*), confirming that neither of them was the source, as there was no marijuana found on either person.

As set out above, the existence of probable cause to support a search requires a "fair probability that contraband or evidence of a crime will be found in a particular place." *Burton*, 288 F.3d at 103 (quoting *Gates*, 462 U.S. at 238). It is well established that the smell of marijuana creates probable cause for a search. *See State v. Walker*, 62 A.3d 897, 901 (N.J. 2013) (collecting cases for the proposition that "the smell of burning marijuana establishes probable cause that there is contraband in the immediate vicinity and that a criminal offense is being committed"); *United States v. Ushery*, 400 F. App'x 674, 676 (3d Cir. 2010) ("It is well settled that the smell of marijuana alone, if articulable and particularized, may establish not merely reasonable suspicion, but probable cause." (citing *United States v. Ramos*, 443 F.3d 304, 308 (3d Cir. 2006))). Absent the possibility of CUMMA's affirmative defense applying, a straightforward application of the "plain smell" doctrine would create probable cause here.

St. Martin argues that the "plain smell" doctrine must give way to CUMMA's affirmative defense. Before Robles began his search, Jackson informed Robles that St. Martin was a qualified CUMMA patient, and St. Martin presented her MMPC. (Pl.'s C-SOF ¶¶ 17, 18.) Robles photographed the card, and another officer called the phone number printed on the card for the NJMMP, with no answer. (*Id.* ¶¶ 28–30.) Robles believed St. Martin's statement that she was a CUMMA patient. (Pl.'s S-SOF ¶¶ 184–86.) St. Martin contends that Robles's acknowledgement that she was a qualified CUMMA patient prevented probable cause from supporting Robles's

search, absent Robles possessing information that led him to believe CUMMA's affirmative defense did not apply.

At the time of the search, marijuana remained a CDS in New Jersey, possession of which was illegal. *See* N.J. Stat. Ann. § 2C:35-10(a)(3) (West 2017) ("possession of more than 50 grams of marijuana" is a fourth degree offense); N.J. Stat. Ann. § 2C:35-5(b)(11) (West 2017) (possession with intent to manufacture, distribute or dispense of "marijuana in a quantity of one ounce or more but less than five pounds" is a third degree offense).[18] CUMMA creates an affirmative defense to violations of New Jersey's CDS laws. *See* N.J. Stat. Ann. § 24:6I-6(a); N.J. Stat. Ann. § 2C:35-18(a). ("It is an affirmative defense to any criminal action . . . that the defendant is the authorized holder of an appropriate registration . . . by virtue of any provision" of CUMMA.). The defendant bears the burden of establishing this affirmative defense by a preponderance of the evidence. § 2C:35-18(a).

At the outset, the Court notes that CUMMA itself suggests that St. Martin cannot wield the affirmative defense to seek monetary relief from Robles. The same provision of the criminal code that permits a defendant to offer a CUMMA affirmative defense states that "[n]o liability shall be imposed by virtue of this chapter . . . upon any duly authorized State officer, engaged in the enforcement of any law or municipal ordinance relating to [CDS]." N.J. Stat. Ann. § 2C:35-18(b). By a plain reading, that is precisely what St. Martin seeks to do here.[19]

---

[18] After February 22, 2021—the date of New Jersey's enactment of the Cannabis Regulatory, Enforcement Assistance, and Marketplace Modernization Act ("CREAMMA"), N.J. Stat. Ann. §§ 24:6I-31, *et seq.*—the amount of marijuana that may lawfully be possessed was increased to six ounces. N.J. Stat. Ann. § 2C:35-10(a)(3)(b). CREAMMA further provided that the "odor of marijuana or hashish . . . shall not constitute reasonable articulable suspicion to initiate a search of a person to determine a violation of subparagraph (b) of paragraph (3) of this subsection." § 2C:35-10(a)(3)(b)(i).

[19] The parties have not briefed the question of whether the Legislature may insulate an officer from liability for a civil rights claim by explicitly providing that the statute may not be read to impose liability on an officer. Therefore, the Court does not end its analysis with the language of N.J. Stat. Ann. § 2C:35-18(b).

The Third Circuit has not set out a precise rule for when an officer should consider the possibility of an affirmative defense in making a probable cause determination. Most recently in *Holman v. City of York, PA*, the Third Circuit rejected the district court's categorical holding as a matter of law that "affirmative defenses are not a relevant consideration" in determining probable cause. 564 F.3d 225, 231 (3d Cir. 2009). The Court concluded that an officer need not consider whether the "necessity" affirmative defense justified the arrestee's trespass offense, because determining the defense would "require[] an analysis of legal considerations that should not concern an arresting officer," including "countless factual permutations to determine the 'necessity' of specific conduct at a given moment in time." *Id.*; *see also Sands v. McCormick*, 502 F.3d 263, 269 (3d Cir. 2007) (holding that an officer need not consider a statute of limitations affirmative defense in determining probable cause in part because the "application of the limitations period is not a clear cut matter in criminal prosecutions").

In *Radich v. Goode*, an earlier case, the Third Circuit assumed without deciding that an officer should consider the availability of an affirmative defense in his probable cause determination. 886 F.2d 1391, 1396 (3d Cir. 1989). The civil rights plaintiff argued that although his conduct met the elements of defiant trespass, the section of the Pennsylvania statute defining the offense provided an affirmative defense if the property was open to the public and the conditions of access imposed on the property were unlawful. *Id.* The Court framed its inquiry as whether an officer, "acting reasonably . . . under the facts and circumstances" known to him, "would know" that the affirmative defense applied. *Id.* at 1396–97. The Court concluded that even accounting for the affirmative defense, probable cause existed because "the legality of the condition imposed [on the property] is not readily discernable to a police officer making arrests . . . ." *Id.* at 1398. The *Holman* Court subsequently distinguished *Radich* on the grounds that the

affirmative defense in *Radich* was "specifically included in the statute setting forth the elements of the crime." *Holman*, 564 F.3d at 230. In *Holman*, the necessity affirmative defense was contained in a separate section of the criminal code, and the statute setting out the elements of defiant trespass did not reference the necessity defense. *Id.*[20]

The Court adopts the approach from *Radich* and assumes without deciding that Robles should have considered whether CUMMA's affirmative defense applied in his probable cause determination.[21] Thus, the relevant question is whether Robles, "acting reasonably . . . under the facts and circumstances" known to him, could conclude that the affirmative defense applied. *Radich*, 886 F.2d at 1396–97. Here, prior to conducting a search, Robles would not have had sufficient information to reach this conclusion. Robles reviewed St. Martin's MMPC, and while he did not recognize it, he ultimately concluded that it was genuine. (Pl.'s C-SOF ¶¶ 24–26; Pl.'s S-SOF ¶¶ 179–87.) In an attempt to confirm her CUMMA status and the amount of marijuana she was entitled to have, another officer at the scene called the number for the New Jersey agency printed on the card itself. (Pl.'s C-SOF ¶¶ 28–30.) Without knowing how much marijuana St. Martin had been prescribed, the quantity of the marijuana St. Martin had in the vehicle, and the source of that marijuana, Robles could not determine whether the quantity and source were authorized by CUMMA and therefore whether the affirmative defense applied. As the statute

---

[20] Indeed, in a more recent decision, the Honorable D. Brooks Smith in concurrence noted that "[d]espite a string of three precedential opinions touching on the subject, we have yet to provide district courts with a clear rule on the subject." *Mazuka v. Rice Twp. Police Dep't*, 655 F. App'x 892, 895 (3d Cir. 2016) (Smith, J., concurring).

[21] Some support for requiring Robles to consider the affirmative defense is found in the logic of *Radich*. In 2017, the elements of a marijuana possession offense were set out in N.J. Stat. Ann. § 2C:35-10, -5, and the affirmative defense was in § 2C:35-18, the same chapter of New Jersey's criminal code addressing CDS offenses. Therefore as in *Radich*, CUMMA's affirmative defense was "specifically included in the statute setting forth the elements of the crime." *Holman*, 564 F.3d at 230. However, unlike in *Radich*, the affirmative defense was not contained in the same section of the statute setting out the offense giving rise to probable cause. *See Radich*, 886 F.2d at 1396 (quoting Pennsylvania's defiant trespass statute).

makes clear, the defense's availability turns not on whether a suspect carries an MMPC but rather whether "conduct is authorized by the provisions of [CUMMA]." N.J. Stat. Ann. § 2C:35-18(a).

The handful of New Jersey cases addressing arguments about CUMMA's effect on the probable cause determination do not suggest otherwise.[22] In *State v. Myers*, an officer "detected the odor of burnt marijuana" coming from the defendant's car and searched the vehicle, discovering a small quantity of marijuana and a handgun, for which the defendant was charged. 122 A.3d 994, 991–92 (N.J. Super. Ct. App. Div. 2015). On appeal, the defendant argued in part that the plain smell doctrine "must be modified due to the 2010 passage of the CUMMA." *Id.* at 1000. At the outset, the Appellate Division observed that CUMMA did not alter the fact that possession of marijuana remained an offense under New Jersey law. *Id.* at 1000 (citations omitted). The Appellate Division examined CUMMA's structure, holding "that persons claiming [CUMMA's] exemption must show they met the CUMMA's requirements" and that because the defendant did not inform the officer that he was a "qualifying patient," there was no need to address CUMMA's impact on the officer's probable cause determination. *Id.* at 1001, 1003. The Court concluded that "absent evidence the person suspected of possessing or using marijuana has a registry identification card, detection of marijuana by the sense of smell, or by the other senses,

---

[22] The Court discusses both published and unpublished New Jersey Appellate Division cases in its decision. While the Appellate Division's decisions are not binding on this Court, federal courts are free to cite state court decisions for illustrative purposes in their interpretation of state law. *See Craig v. Lake Asbestos of Quebec, Ltd.*, 843 F.2d 145, 152 (3d Cir. 1988) (". . . [W]e would be remiss in our duty to apply New Jersey law were we to ignore a New Jersey case where the relevant issue is identical."); *see also Reid v. Transp. Ins. Co.*, 502 F. App'x 157, 160 (3d Cir. 2012) (affirming district court's reliance on unpublished New Jersey decision where the court "explicitly acknowledged that [it] was an unpublished decision"). Where indicated here, this Court cites Appellate Division decisions when their discussions are persuasive and adopts their reasoning as its own.

provides probable cause to believe that the crime of unlawful possession of marijuana has been committed." *Id.* at 1003.[23]

St. Martin points to this sentence from *Myers* to argue that St. Martin presenting her MMPC to Robles defeated his probable cause determination. However, the Appellate Division specifically avoided deciding whether CUMMA's passage affected the officer's probable cause determination because the arrestee there did not present an MMPC. In fact, just last year, the Appellate Division reached the same conclusion in an unpublished case with facts similar to those here. *See State v. Griffin*, No. A-0461-20, 2023 WL 2229491 (N.J. Super. Ct. App. Div. Feb. 27, 2023), *cert. denied*, 297 A.3d 667 (N.J. 2023).[24] On appeal from his criminal conviction, the defendant contended that during a traffic stop, he "repeatedly attempted to show his [MMPC] to the officer." *Id.* at *1. The defendant argued that despite the fact that the officer smelling raw marijuana from the vehicle was "consistent with lawful possession," the officer did not "attempt to confirm or dispel" the defendant's claim that his possession was lawful and instead searched the vehicle, uncovering contraband used in the defendant's prosecution. *Id.* The Appellate Division affirmed the trial court's finding that probable cause supported the search:

> We acknowledge defendant was a registered patient under [CUMMA], and the officers' observations, including the smell of raw marijuana, could therefore have been consistent with lawful use. We disagree, however, [that] defendant's registry status prohibited the officers from conducting a search, even for marijuana, where there was probable cause to believe the vehicle contained unlawfully obtained marijuana. . . . [I]n certain circumstances, like those presented here, officers may have probable cause to believe non-

---

[23] *See also State v. Desir*, No. A-3581-18T1, 2020 WL 7586149, at *4 (N.J. Super. Ct. App. Div. Dec. 22, 2020) ("CUMMA did not replace the 'plain smell' doctrine."); *State v. Holley*, No. A-5547-15T3, 2017 WL 6492488, at *3 (N.J. Super. Ct. App. Div. Dec. 19, 2017) ("[T]he detection of an odor of marijuana continues to provide probable cause to believe that the crime of unlawful possession of marijuana has been committed.").

[24] The parties do not discuss *Griffin*, which was issued after the parties served their opening and opposition briefs on each other.

> authorized marijuana possession or use is taking place regardless of the suspect's [CUMMA] registry status.

*Id.* at *1, 4. Probable cause supported the officer's search because he smelled raw marijuana coming from the vehicle, observed cigar wrappers in the vehicle, only the defendant (and neither of the other two passengers) claimed to be a CUMMA patient, the defendant denied that the vehicle contained raw marijuana, and the defendant "fail[ed] to establish the odor emanated from lawfully obtained marijuana." *Id.* at *4–5. Likewise here, Robles detected the "strong" odor of marijuana coming from the vehicle, in which only St. Martin, not Jackson, was the only claimed CUMMA patient. (Pl.'s C-SOF ¶¶ 11–12, 17–19.) Because St. Martin had not established that the odor of marijuana emanated from lawfully obtained marijuana, Robles had probable cause to search the vehicle to confirm how much marijuana St. Martin possessed and where it came from—*i.e.* whether St. Martin's possession was lawful.

St. Martin's reliance on the Guidelines does not change this conclusion. The Amended Complaint and St. Martin's opposition brief cite repeatedly to the Guidelines in support of their argument for how Robles should have conducted his investigation. (FAC ¶¶ 8–10, 51, 71; Pl.'s Br. at 3, 16, 21–22.) Defendants point to express limiting language in the Guidelines to argue that they cannot be used "as a benchmark to evaluate the constitutionality of the search." (Defs.' Br. at 10; *see also id.* at 27.) Defendants also contend that in any event, Robles complied with the Guidelines. (*Id.* at 10–11.)

In general, a state's self-imposed guidelines for its own law enforcement do not create enforcement rights in third parties. For example, a state is "free to prefer one search-and-seizure policy among the range of constitutionally permissible options, but its choice of a more restrictive option does not render the less restrictive ones unreasonable, and hence unconstitutional." *Virginia v. Moore*, 553 U.S. 164, 175 (2008). In *Moore*, the Supreme Court held that the Fourth Amendment

did not require exclusion of evidence obtained as the result of a search incident to arrest that, while constitutionally sound, violated state law that classified the underlying offense as a misdemeanor for which officers should have issued a summons rather than effected an arrest. *Id.* at 171–77. The Court concluded that "while States are free to regulate such arrests however they desire, state restrictions do not alter the Fourth Amendment's protections." *Id.* at 176; *see also United States v. Laville*, 480 F.3d 187, 192 (3d Cir. 2007) ("[W]e made it quite clear that the validity of an arrest under state law must never be confused or conflated with the Fourth Amendment concept of reasonableness, and that the validity of an arrest under state law is at most a factor that a court may consider in assessing the broader question of probable cause.").[25]

Perhaps anticipating civil suits like St. Martin's here, the Guidelines themselves caution that they should not "be construed or applied to invalidate an investigative detention, arrest, search, seizure, or charge that is made in accordance with applicable State law." (Guidelines at 1 n.1.) Other language in the Guidelines reinforces this point. For example, they note that a person who "refuse[s] a consent search that would enable [an] officer to visually inspect the marijuana, the officer may in the exercise of his or her discretion proceed as if the affirmative defense does not apply or has not been proved . . . ." (*Id.* at 19.) Later, the Guidelines provide that when an officer develops probable cause via the "plain smell" of marijuana, the probable cause for the investigation "continues . . . until the officer is reasonably satisfied from the on-scene investigation that the

---

[25] *See also United States v. Caceres*, 440 U.S. 741, 751–52 (1979) (holding that IRS's failure to follow its internal procedures for securing approval before wiretapping investigatory target did not require the evidence's exclusion because the "violations of agency regulations . . . d[id] not raise any constitutional questions"); *United States v. Wilson*, 699 F.3d 235, 244–45 (2d Cir. 2012) (Immigrations and Customs Enforcement directive); *United States v. Felipe*, 148 F.3d 101, 109 (2d Cir. 1998) (United States Postal Service regulations); *United States v. Myers*, 123 F.3d 350, 356 (6th Cir. 1997) (United States Attorney's Manual); *United States v. Peters*, 153 F.3d 445, 452 n.9 (7th Cir. 1998) ("[T]he rules in the Internal Revenue Manual were adopted for the internal administration of the service and not for the protection of the taxpayer . . . ." (citation omitted)).

CUMMA affirmative defense is applicable." (*Id.* at 23–24.) Applying the reasoning of *Moore* and the Guidelines' plain language, the Court concludes that St. Martin may not rely on Robles's perceived failure to follow the Guidelines in arguing that the Fourth Amendment requirements of probable cause were not met here.

Even if the Court were to consider the Guidelines in evaluating whether a question of fact exists about Robles's probable cause determination, it would find that he complied with the Guidelines' recommended procedures. The Guidelines recognize an officer's discretion, when presented with an MMPC, to "proceed as if the affirmative defense does not apply or has not been proved" and "leave ultimate resolution of the applicability of the affirmative defense to the prosecutor and/or the court." (Guidelines at 9.) The officer's investigation "need not be limited to verifying that a person is registered . . . , since a registered qualifying patient . . . may engage in marijuana-related conduct that falls outside the CUMMA exemption from criminal liability." (*Id.* at 24.) Indeed, as the Guidelines illustrate, there are numerous ways in which a CUMMA patient possessing marijuana may nonetheless violate New Jersey's CDS laws. For example, an ATC may only dispense two or fewer ounces of marijuana to a patient at one time, and no patient may be lawfully dispensed more than two ounces within a thirty-day period. (*Id.* at 14 (citing N.J. Stat. Ann. § 24:6I-10).) Thus, Robles detecting a strong odor of marijuana, which St. Martin admitted she had in her vehicle, could have been consistent with either lawful or unlawful possession. The information available to Robles at the scene did not permit him to answer this question either way, and the Guidelines therefore permitted him to continue his investigation to determine whether the marijuana was legally obtained and possessed.[26]

---

[26] St. Martin's retention of an expert who formed an opinion on probable cause does not create a question of fact barring summary judgment. Blaettler writes in his report that based on his understanding of the law, "at the time Plaintiff was arrested Defendants lacked probable cause to believe a crime had been committed." (Blaettler Rpt. at 18.) However, "it is not permissible for a witness to testify as to the governing

St. Martin also argues that even if probable cause supported the search, Robles was required to secure a warrant before searching. (Pl.'s Br. at 12–14.) Robles responds that the automobile exception to the warrant requirement justified the warrantless search here. (Defs.' Br. at 11–13.) The Fourth Amendment generally requires that law enforcement obtain a warrant before conducting a search. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) ("[A] search conducted without a warrant issued upon probable cause is [presumptively] unreasonable . . . subject only to a few specifically established and well-delineated exceptions."). "The automobile exception to the warrant requirement permits law enforcement to seize and search an automobile without a warrant if 'probable cause exists to believe it contains contraband.'" *Burton*, 288 F.3d at 100 (quoting *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996)). New Jersey law adds a layer above the federal Constitution's warrant requirement, permitting warrantless search only if the circumstances giving rise to probable cause were "unforeseeable and spontaneous." *State v. Witt*, 126 A.3d 850, 874 (N.J. 2015).

Here, the circumstances justified a search without a warrant. As explained above, Robles had probable cause for his search, satisfying the Fourth Amendment's warrant requirement. *See Castillo v. Stepien*, No. 05-1073, 2009 WL 4142725, at *10 (D.N.J. Nov. 24, 2009) (granting summary judgment on section 1983 claim because warrantless search of car fell under the automobile exception); *Simonson*, 839 F. App'x at 741 (affirming grant of summary judgment

---

law." *United States v. Leo*, 941 F.2d 181, 196 (3d Cir. 1991). Courts in the Third Circuit routinely exclude expert testimony regarding the existence of probable cause. *See, e.g.*, *Smith v. New Jersey*, No. 09-4268, 2013 WL 3658786, at *4 (D.N.J. July 11, 2013) (excluding expert report "replete with legal conclusions and citations to cases and statutes," including that no probable cause supported an arrest, for failure to comply with Federal Rule of Evidence 702); *Quagliarello v. Dewees*, 802 F. Supp. 2d 620, 625 (E.D. Pa. 2011) (precluding expert opinion as to whether officer had "probable cause" and whether the municipality showed "indifference"); *Geonnotti v. Amoroso*, No. 07-1522, 2008 WL 8893708, at *1 n.1 (E.D. Pa. Mar. 18, 2008) ("Defendants' proposed expert thus cannot testify to the existence of probable cause, as 'allowing the plaintiff to elicit such testimony from an expert witness would have usurped the role of the Court and the jury.'" (quoting *Pullman–Standard v. Swint*, 456 U.S. 273, 289 n.19 (1982))).

because the automobile exception justified the warrantless search). Nor is there any suggestion that Robles suspected the vehicle contained contraband before he effectuated the traffic stop. *Witt*, 126 A.3d at 873–74. Therefore, probable cause for the search following the lawful traffic stop was "unforeseeable and spontaneous." *See State v. Rodriguez*, 207 A.3d 272, 277–79 (N.J. Super. Ct. App. Div. 2019) (holding that a search incident to a lawful, unplanned traffic stop was "unforeseeable and spontaneous" under *Witt*).

Finally, as probable cause supported Robles's search of the vehicle for the source of the strong raw marijuana odor, probable cause supported the search of St. Martin's handbag. Robles's search of the BMW did not turn up the raw marijuana, whose odor Robles called "extreme." (Pl.'s C-SOF ¶¶ 11–12.) Therefore, Robles could reasonably assume that the marijuana was in a location in the vehicle that he had not yet searched. *See State v. Guerra*, 459 A.2d 1159, 1161 (N.J. 1983) (probable cause existed to search vehicle's trunk when officers "detected a strong odor of marijuana" that "could not have emanated from the small suitcase in the car's interior" they already searched); *United States v. Ross*, 456 U.S. 798, 825 (1982) ("If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search.").

### 2.    Seizure During the Vehicle Stop and Search

Count One also alleges that Robles unlawfully "detain[ed]" St. Martin, (FAC ¶ 58), which St. Martin's brief narrows to the period of time during the traffic stop when Robles investigated the marijuana, (Pl.'s Br. at 8–11). St. Martin contends that because Robles lacked probable cause or reasonable suspicion that St. Martin was violating any law, the approximately one hour in which St. Martin was kept at the scene of the stop—beyond the time needed for Robles to cite Jackson for the traffic infraction—constituted an unlawful seizure. (*Id.*)

When an officer lawfully stops a vehicle, the officer is normally permitted to inquire into other, unrelated matters so long as they do not "measurably extend the duration of the stop." *Arizona v. Johnson*, 555 U.S. 323, 333 (2009). "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015). However, when during a lawful stop an officer develops "reasonable suspicion or probable cause" of criminal activity, the stop may be extended. *United States v. Garner*, 961 F.3d 264, 269–70 (3d Cir. 2020) (citing *Johnson*, 555 U.S. at 333).

Here, Robles smelled marijuana coming from the vehicle as soon as he approached the passenger-side window, even before he began the tasks tied to the traffic infraction. As explained above, the plain smell doctrine created probable cause to investigate whether there was unlawfully-possessed marijuana in the vehicle. *See United States v. Green*, 897 F.3d 173, 186 (3d Cir. 2018) (finding reasonable suspicion justified extending a lawful traffic stop based on the officer smelling marijuana). While St. Martin subsequently presented her MMPC, this did not nullify Robles's probable cause determination, and Robles's subsequent hour-long attempts to verify St. Martin's CUMMA status and the lawfulness of the marijuana she possessed, (Pl.'s S-SOF ¶ 62), were consistent with probable cause.[27] Therefore, the time St. Martin spent at the scene of the traffic stop while Robles conducted his hour-long investigation does not constitute an unlawful detention in violation of the Fourth Amendment.

\* \* \*

---

[27] St. Martin argues that in attempting to verify the lawfulness of the marijuana, Robles "fumble[d], badly" and acted based on "an uneducated, speculative guess." (Pl.'s Br. at 9–10.) She also argues that by remaining at the scene of the traffic stop an extra hour, she missed attending Easter services with her family and was caused "considerable mental anguish." (*Id.* at 10.) However, these characterizations of Robles's investigation and arguments about how the interaction regrettably affected St. Martin do not affect probable cause.

Therefore, viewing the facts in the light most favorable to St. Martin, the Court finds that probable cause supported Robles's April 16, 2017 search of St. Martin's vehicle and handbag and the accompanying seizure at the scene while Robles conducted his investigation.

**B.    COUNT TWO – SECTION 1983 FALSE ARREST AND IMPRISONMENT**

Moving past the April 16, 2017 search, Count Two alleges a Section 1983 claim for false arrest and imprisonment under the Fourth Amendment. (FAC ¶¶ 60–62.) St. Martin contends that Robles's decision to issue a summons complaint for her arrest the following day was not supported by probable cause. (Pl.'s Br. at 21–24.) St. Martin argues that Robles's probable cause affidavit does not provide sufficient facts to "invalidate[] the plaintiff's MMPC as an affirmative defense under the CUMMA." (*Id.* at 21.) Per St. Martin, Robles improperly construed St. Martin's "absence of a prescription on hand" as an element of the criminal offense. (*Id.* at 22–23.) In her view, the fact that neither CUMMA nor the Guidelines require a qualified patient to carry their prescription with them and keep their prescribed marijuana in its original packaging vitiated Robles's probable cause. (*Id.* at 23–24.)

Defendants seek dismissal on Count Two, contending that Robles had probable cause to arrest St. Martin as soon as he "discovered the four plastic bags of unlabeled raw marijuana" during the traffic stop on April 16. (Defs.' Br. at 17.) Defendants note that none of the information Robles acquired in his subsequent investigation—when Van Ness contacted the NJHMMP or Robles searched online and subsequently spoke with St. Martin—allowed Robles to believe the marijuana was lawfully dispensed. (*Id.* at 17–21.) Defendants contend that St. Martin's focus on Robles's probable cause affidavit is incompatible with the objective inquiry for probable cause. (Defs.' Reply at 13–15.)

Establishing a claim for false arrest or imprisonment under the Fourth Amendment requires showing that there was an arrest and that the arrest was made without probable cause. *See James v. City of Wilkes-Barre*, 700 F.3d 675, 680 (3d Cir. 2012) (false arrest); *Groman*, 47 F.3d at 636 (false imprisonment); *see also Wildoner v. Borough of Ramsey*, 744 A.2d 1146, 1154 (N.J. 2000) ("[P]robable cause is an absolute defense to Plaintiff's false arrest, false imprisonment, and malicious prosecution claims."). Probable cause supporting arrest exists if "the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested." *Orsatti*, 71 F.3d at 483 (citing *United States v. Cruz*, 910 F.2d 1072, 1076 (3d Cir. 1990)). Probable cause is a "fluid concept," the determination of which requires a court to apply a "totality-of-the-circumstances approach." *Gates*, 462 U.S. at 232–33. Probable cause for an arrest does not depend on "whether the suspect actually committed any crime, and 'the mere fact that the suspect is later acquitted of the offense for which he is arrested is irrelevant.'" *Johnson v. Campbell*, 332 F.3d 199, 211 (3d Cir. 2003) (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 36, (1979)).

Here, the Court concludes that based on the evidence available to Robles after his interaction with St. Martin on April 16 and his investigation the next day, he had probable cause to issue a summons complaint for St. Martin's arrest. As explained above, possession of more than 50 grams of marijuana is a fourth degree criminal offense in New Jersey. N.J. Stat. Ann. § 2C:35-10(a)(3). Regardless of subsequent forensic testing that revealed that the raw marijuana in the four plastic bags weighed approximately 53 grams—which still exceeded the fourth degree threshold—Robles weighed it at the station and estimated that it weighed 76 grams. (Pl.'s C-SOF ¶ 98.) Although St. Martin had presented her MMPC and Robles believed she was a registered patient,

her registration status did not automatically render any marijuana she may have possessed lawful. (Guidelines at 24 ("[A] registered qualifying patient . . . may engage in marijuana-related conduct that falls outside the CUMMA exemption from criminal liability.").)

After confiscating the marijuana on April 16, Robles attempted to verify the lawful amount and source of the marijuana. Van Ness called the number for the NJMMP listed on St. Martin's MMPC and provided his credentials. (Pl.'s C-SOF ¶¶ 85–89.) Once verified, Van Ness spoke with someone—identified as "Takia"—who confirmed St. Martin's registration status and informed Van Ness that she had a record of all of St. Martin's medical marijuana purchases. (*Id.* ¶¶ 91–92.) Takia told Van Ness that St. Martin had only filled her prescription once, several days before, from the GSD for 3/8 ounces (approximately 10.6 grams). (*Id.* ¶¶ 94–95.) Takia confirmed that any amount of marijuana St. Martin possessed over those 3/8 ounces were not legally dispensed. (*Id.* ¶ 96.) As an extra step, Robles checked the GSD's website to see whether two of the strains of marijuana hand-written on the plastic bags—"Master Kush" and "MK"—were listed in that dispensary's inventory. (*Id.* ¶¶ 101–03.) The search turned up no records. (*Id.*) Robles then called St. Martin, who relayed her authorized purchase history, which included more than just the 3/8 ounces that Takia stated. (*Id.* ¶¶ 95, 104–05.) However, St. Martin informed Robles that she did not have documentation supporting her specific purchases described to Robles. (*Id.* ¶ 106.)[28] While

---

[28] St. Martin denies this statement, writing that "Robles never asked for her prescribing doctor's name and address." (Pl.'s C-SOF ¶ 106.) However, Robles certified that St. Martin was unable to provide documentation verifying prescriptions for "the *amount* of marijuana" Robles found, (Robles Cert. ¶ 61 (emphasis added)), which is a different question. Robles would not have needed to ask for St. Martin's doctor's information because he did not need to confirm that she was a registered CUMMA patient; he needed to confirm the amount and source of her marijuana. St. Martin's denial cites a paragraph of her own certification that is not to the contrary. (*See* Cert. of Carla St. Martin ¶ 31, Ex. 6 to Joseph Cert., ECF No. 68-3 ("Neither at the scene of the car stop on Easter Sunday, nor before my arrest the next day on April 17, 2017, did any officer ask me to sign any document to allow the police to get copies of my records from DOH. Had they asked, I would've agreed because I had nothing to hide.").) Because St. Martin's denial does not contradict Robles's statement, the Court deems this fact admitted.

St. Martin possessed two plastic containers that had labels showing the marijuana contained was dispensed from a licensed dispensary to St. Martin's name, each container was labeled for only 3.5 grams, (*id.* ¶¶ 33–34), significantly below the 76 grams Robles estimated were contained in the four hand-labeled bags or the approximately 53 grams as weighed per the forensic analysis.[29]

Taking this information together, the "facts and circumstances" within Robles's knowledge were sufficient to "warrant a reasonable person to believe" that the seized marijuana was unlawfully possessed. *Orsatti*, 71 F.3d at 483. Therefore, probable cause supported Robles's decision to charge St. Martin for violating N.J. Stat. Ann. § 2C:35-10(a)(3).

St. Martin's arguments to the contrary are unavailing. St. Martin contends that Robles misapplied the provisions of CUMMA and therefore the New Jersey Supreme Court's decision in *State v. Carter*, 255 A.3d 1139, 1162 (N.J. 2021) vitiates probable cause. (Pl.'s Br. at 23–24.) *Carter* holds that "[a]n officer's reasonable but mistaken interpretation of a statute cannot change the fact that the law does not criminalize particular conduct." *Carter*, 255 A.3d at 1163. St. Martin notes that Robles's probable cause affidavit states that St. Martin "did not have a prescription for the suspected raw marijuana" and that the four plastic bags "did not contain prescription labels or branding identifying it as being a prescribed drug." (Ex. 12 to Joseph Cert., ECF No. 68-3.) St. Martin interprets this to mean that Robles improperly viewed the fact that St. Martin did not carry her prescription with her and had removed her marijuana from its original packaging as elements of the offense for which she was charged.

---

[29] St. Martin submits significant documentation regarding her medical marijuana purchases in opposing summary judgment. (*See* Exs. 14–18 to Joseph Cert., ECF No. 68-3.) St. Martin's expert also writes that "[h]ad Defendants simply issued a subpoena to the [GSD] or contacted the NJSP RIOC (as per the AG CUMMA Guidelines) they would have determined that Plaintiff was legally in possession of the medical marijuana she possessed." (Blaettler Rpt. at 23.) However, the existence of probable cause does not turn on steps that Robles could have taken that might have exculpated St. Martin.

However, Robles did not improperly construe these facts as elements of the offense. St. Martin was charged for violating N.J. Stat. Ann. § 2C:35-10(a)(3).[30] Unlike in *Carter*, the probable cause here did not arise from an officer's mistaken belief that conduct violated New Jersey law. 255 A.3d at 1159. St. Martin lacking a prescription and not carrying marijuana in dispensary packaging were rather part of the totality of "facts and circumstances" that Robles appropriately considered in his probable cause determination. Indeed, the Guidelines specifically warn that the failure to keep medical marijuana in the original packaging is a "relevant factor" for Robles to consider. (Guidelines at 19–20.)[31]

St. Martin also challenges the identity of Takia and whether she had authority or knowledge for Robles to rely on her. (Pl.'s C-SOF ¶¶ 28–29; Pl.'s Br. at 22.) In determining probable cause, courts "routinely recognize[] a distinction between information provided by an informant and that provided by a law enforcement officer or other government agency." *United States v. Yusuf*, 461 F.3d 374, 384 (3d Cir. 2006). Van Ness—and through him Robles—received information about the amount of marijuana St. Martin could lawfully have by calling the number for the NJMMP, the state agency that maintains the database of CUMMA patients. Takia was not an unreliable or untested informant but rather a government employee; St. Martin points to no cases that suggest Robles could not have trusted the information provided by a state employee. What matters for probable cause is not whether Takia was right but whether there was reason for Robles

---

[30] Noting whether St. Martin had documentation for the marijuana in her possession or whether the marijuana was labeled does not show that Robles believed these facts were elements of the offense. Rather, they were part of his consideration in determining whether St. Martin had established the CUMMA affirmative defense.

[31] St. Martin cites the Guidelines' instruction that "[t]he fact that a person has removed medical marijuana from its original packaging does not mean that the CUMMA affirmative defense is unavailable to that person." (Guidelines at 19.) As explained above, failure to comply with the Guidelines does not vitiate probable cause. Instead, this statement merely makes clear that a CUMMA patient may, consistent with their burden to establishing a CUMMA affirmative defense, avoid conviction for a marijuana offense even when the marijuana is removed from the original packaging.

to not trust her.[32] Therefore, viewing the facts in the light most favorable to St. Martin, the Court finds that Robles appropriately "t[ook] into account the nature and source of the information" when relying on Takia's statements to issue a complaint. *Yusuf*, 461 F.3d at 384.

Ultimately, St. Martin's argument rests on the idea that there is more Robles could have done to confirm whether the seized marijuana was lawfully dispensed and possessed. The Third Circuit dismissed similar arguments in *Turkos*, 721 F. App'x at 208. There, the plaintiff had sought the police to enforce a protective order against her ex-husband. *Id.* at 210. Officers attempted to verify the order's validity by calling the regional 911 Center and the local sheriff's department, which both reported that no protective order was in effect. *Id.* While a separate state office provided a court order suggesting otherwise, the officers concluded despite the conflicting information that the court order had been vacated. *Id.* The plaintiff was ultimately charged with tampering with public records and making a false report. *Id.* The prosecutor determined that conflicting evidence would make prosecution difficult, and all the charges were dismissed. *Id.* at 211. The plaintiff then filed a section 1983 claim, and the District Court granted the defendants' motion for summary judgment on all counts. *Id.*

On appeal, the Third Circuit affirmed, with the Honorable Joseph A. Greenaway, Jr. writing for the Court that "probable cause existed as a matter of law." *Id.* at 212. The Court found that the police "collected substantial evidence indicating that no [protective order] was in effect." *Id.* They contacted the 911 Center to check the statewide registry, which was the "authoritative source for such information." *Id.* Additional evidence from the sheriff's office and the prothonotary's office supported the officer's belief that the protective order had expired. *Id.* The

---

[32] St. Martin sets out her marijuana purchase history, arguing that the information Takia gave Van Ness was wrong. (Pl.'s C-SOF ¶ 95.) However, as explained above, whether St. Martin "actually committed any crime" does not change the probable cause to arrest that existed based on the information Robles knew at the time. *Campbell*, 332 F.3d at 211.

plaintiff's argument that the protective order was in fact was irrelevant because the "facts that were within [the officers'] knowledge were sufficient to lead a reasonable person to believe that [the plaintiff] had committed the crimes at issue when she . . . sought enforcement of what was, as best as [the officers] could tell, an expired [protective order]." *Id.* at 213. Further, the officers' awareness of conflicting evidence did "not preclude a finding of probable cause on summary judgment." *Id.* (citing *Dempsey*, 834 F.3d at 468); *see also id.* (probable cause may exist even if "the ultimate decision to prosecute" was not "prudent").

Similarly here, the fact that Robles could have conducted a different investigation to uncover facts favorable to St. Martin does not compromise Robles's probable cause determination. Like the officers in *Turkos*, Robles attempted to validate the amount of marijuana St. Martin could possess by consulting the "authoritative source for such information." *Id.* at 212. The facts that were within Robles's knowledge—that the marijuana was in plastic bags with handwritten labels, that St. Martin could not produce a receipt of her purchase from the dispensary, that a call to the NJMMP advised that St. Martin had not been legally dispensed the total volume of marijuana found, that amount St. Martin possessed was beyond the monthly two-ounce threshold she could have been legally dispensed over the prior month, that the GSD's website did not list the marijuana strains St. Martin had written on the plastic bags—showed that "as best as [Robles] could tell," the marijuana was not legally dispensed. *Id.* at 213. St. Martin's list of steps Robles *could have* taken— waiting for a chemical test to come back on the four bags of marijuana, seeking further records from the NJMMP about her marijuana purchase history, directly contacting the GSD, or otherwise delaying charging her given "the lack of urgency to prosecute," (Pl.'s Br. at 29)—are all beside the point. St. Martin may well be correct that had Robles taken further investigatory steps, she would have been vindicated. Perhaps even the decision to write out the complaint on April 17 was

not "prudent." *Turkos*, 721 F. App'x at 213. However, police are not required to perform a perfect investigation. *Wright*, 409 F.3d at 603 ("Although [the police officers] may have made a mistake, their belief was not unreasonable in light of the information the officers possessed at the time."); *see also Davis v. Malitzki*, 451 F. App'x 228, 233 (3d Cir. 2011) ("[E]vidence that might exonerate a defendant does not defeat probable cause." (citing *Merkle*, 211 F.3d at 790 n.8)). Robles's steps to determine whether the CUMMA defense applied was sufficient as a matter of law.

### C.    COUNT THREE – SECTION 1983 MALICIOUS PROSECUTION

Count Three is a malicious prosecution claim brought pursuant to 42 U.S.C. § 1983. (FAC ¶¶ 63–66.) St. Martin contends that Robles lacked a reasonable belief that the marijuana she possessed was illegally obtained and failed to include that St. Martin showed him her MMPC in his report. (*Id.*) Robles moves for summary judgment on Count Three, arguing that he had probable cause to file a criminal complaint, that St. Martin has not discovered any evidence that the complaint's filing was motivated by malice, and that St. Martin did not suffer a deprivation of liberty because she was never taken into custody. (Defs.' Br. at 23–25.)

St. Martin "concedes the point" that she was never incarcerated and therefore never suffered a deprivation of liberty under the Fourth Amendment. (Pl.'s Br. at 27.) However, she argues that Defendants "assume her malicious prosecution claim rests" on Fourth Amendment grounds even though "[i]t does not," (*id.* at 26), and that her concession is "limited to" her Fourth Amendment malicious claim, (*id.* at 27). St. Martin argues that she can nonetheless pursue a malicious prosecution claim under the NJCRA for "depriving her of due process under the 14th Amendment, and her substantive rights, privilege or immunities secured by the Constitution or laws of [New Jersey]." (*Id.* (citation omitted).)[33] Under this theory, St. Martin's Fourteenth

---

[33] Count Three of the Amended Complaint alleges malicious prosecution under federal law, i.e. Section 1983. (FAC ¶¶ 63–66.) Count Five alleges a violation of the NJCRA for rights under Article I,

Amendment due process rights were violated when her medical marijuana was confiscated and not returned. (*Id.* at 27–28.) She concludes that Robles's malice can be inferred from the lack of probable cause. (*Id.* at 25, 28–29.)[34] On reply, Defendants object to St. Martin's Fourteenth Amendment procedural due process theory because it was not raised in the Amended Complaint. (Defs.' Reply at 17–19.)

Summary judgment will be granted on the malicious prosecution count. By "conced[ing] the point" that Plaintiff never suffered a deprivation of liberty under the Fourth Amendment, (Pl.'s Br. at 27), Plaintiff fails to state a claim for malicious prosecution under the Fourth Amendment. *See Estate of Smith v. Marasco*, 318 F.3d 497, 521 (3d Cir. 2003) (noting one element of a claim for malicious prosecution in violation of the Fourth Amendment is that "the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding"); *see also Laufgas v. Patterson*, 206 F. App'x 196, 198 (3d Cir. 2006) (two-hour detention was not a "deprivation of liberty consistent with the concept of seizure" sufficient to sustain a malicious prosecution claim).

St. Martin cannot sidestep this deficiency in her malicious prosecution claim by adding to her claims on summary judgment. As a general matter, a plaintiff "may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment." *Jones v. Treece*, 774 F. App'x 65, 67 (3d Cir. 2019) (citation omitted). The three paragraphs of Count Three only allege "[a] malicious prosecution claim under § 1983" and cite *Johnson v. Knorr*, 477 F.3d 75, 81

---

Section 7 of the New Jersey Constitution. (*Id.* ¶¶ 73–76.) St. Martin appears to interpret Count Five to allege violations of each of the claims in Counts One through Four, brought under section 1983, to be brought under the NJCRA as well.

[34] St. Martin also mentions her argument of "substantive due process state created danger that spawned from defendants' wrongdoing, resulting in emotional distress." (Pl.'s Br. at 27.) St. Martin does not articulate how this relates to Robles or her malicious prosecution claim, and therefore the Court addresses this claim below.

(3d Cir. 2007), in which the Third Circuit considered whether summary judgment was appropriate on a section 1983 malicious prosecution claim under the Fourth Amendment. (FAC ¶¶ 63–65.) Count Three's factual allegations are limited to "Robles fail[ing] to report that Plaintiff showed the MMPC before he searched the vehicle or her belongings and that he lacked any reasonable belief that the marijuana in her possession was illegally obtained." (*Id.* ¶ 66.) In contrast, St. Martin's opposition brief alleges a new legal theory under Count Three: a "property-related 14th Amendment due process claim" based on "Robles confiscat[ing] her medical marijuana on April 16, 2017" and Defendants allegedly "refus[ing] to return it." (Pl.'s Br. at 27–28.)

As Defendants object, they would likely have "focused their discovery efforts" differently had St. Martin plead a procedural due process claim from the outset. (Defs.' Br. at 19.) But instead, Defendants focused on the Fourth Amendment malicious prosecution claim based on the issuance of the summons complaint that St. Martin actually pleaded. *See Laurie v. Nat'l Passenger R.R. Corp.*, 105 F. App'x 387, 393 (3d Cir. 2004) (finding that "[b]ecause of undue delay and prejudice," the district court did not abuse its discretion by refusing to allow plaintiffs to assert a new claim at the summary judgment stage); *see also Tirone v. Trella*, No. 03-257, 2007 WL 3170098, at *6 (D.N.J. Oct. 29, 2007) ("Adding claims to a pleading is properly done by amending the complaint; it is too late to introduce an additional claim at the summary judgment stage"). The Court finds that St. Martin cannot amend Count Three to allege a Fourteenth Amendment violation at this stage and would grant summary judgment on this basis alone. *See Wilson v. Healy*, 63 F. App'x 613, 616 (3d Cir. 2003) (affirming that plaintiff "of course, had no right to amend his complaint at the summary judgment stage of litigation" to add malicious prosecution claims

against certain defendants when the "only allegations of malicious prosecution in the complaint were raised" against different defendants).[35]

Even if the Court were to consider a Fourteenth Amendment due process claim on the merits, it would still grant summary judgment. The Third Circuit has made clear that "there is no cognizable Fourteenth Amendment procedural due process claim [when] the state provided a reasonable post-deprivation process to challenge the seizure of property and request its return." *McKenna v. Portman*, 538 F. App'x 221, 224 (3d Cir. 2013); *see also Hudson v. Palmer*, 468 U.S. 517, 533 (1984) ("[A]n unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful post-deprivation remedy for the loss is available."). Here, New Jersey provides adequate "procedures to recover wrongfully seized property, such as the ability to move in the criminal action for return of his property or the ability to file a separate action for a writ of replevin." *Revell v. Port Auth. of New York, New Jersey*, 598 F.3d 128, 139 (3d Cir. 2010) (citing *New Jersey v. One 1986 Subaru*, 576 A.2d 859 (N.J. 1990); N.J. Ct. R. 3:5-7; N.J. Ct. R. 4:61-1). St. Martin has not alleged, let alone adduced evidence to show, that New Jersey's post-deprivation procedures were inadequate for the return of her several ounces of confiscated marijuana. Instead, St. Martin only cites her certification and Defendants' interrogatory responses that Defendants would only return the marijuana "with a valid court order." (Pl.'s S-SOF ¶¶ 124–25.) Therefore, granting summary judgment on this claim is appropriate. *See Revell*, 598 F.3d at 139 (affirming grant of summary judgment on Fourteenth Amendment due process for the return

---

[35] Two sentences of the Amended Complaint—one in the introductory paragraph and one in the factual allegations—mention the Fourteenth Amendment. (FAC at ¶¶ 1, 49.) One sentence says the marijuana was never returned to St. Martin, (*id.* ¶ 35), but does not mention this as a basis for any of St. Martin's claims. These allegations are insufficient to render each of St. Martin's five claims as arising under the Fourteenth Amendment and relating to the unreturned marijuana.

of seized property because plaintiff "has failed to explain why New Jersey's state procedures to recover wrongfully seized property . . . are insufficient").

St. Martin's attempt to save the malicious prosecution claim by drawing a distinction between the elements required for a federal section 1983 claim compared to a NJCRA claim fares no better. It is well-established that the analysis for a New Jersey constitutional malicious prosecution claim is the same as a federal constitutional claim. *See Estate of Martin v. U.S. Marshals Serv. Agents*, 649 F. App'x 239, 245 n.4 (3d Cir. 2016) ("[I]t appears undisputed that [p]laintiffs' claims under the New Jersey Constitution and the New Jersey Civil Rights Act trigger the same legal elements and principles as . . . [the] federal causes of action [under Section 1983]."); *Lucia v. Carroll*, No. 12-3787, 2014 WL 1767527, at *5 (D.N.J. May 2, 2014) (finding that the analysis for plaintiff's Article 1, Paragraph 7 of the New Jersey Constitution malicious prosecution claim was the same as its Section 1983 claims).[36] In any event, it defies common sense that a malicious prosecution claim for the non-return of St. Martin's marijuana is cognizable without proving that her marijuana was unlawfully seized.

## D.    QUALIFIED IMMUNITY FOR ROBLES

To the extent the Court finds that any of St. Martin's claims against Robles survive summary judgment on the merits of the claims, Robles claims qualified immunity. (Defs.' Br. at 31–34.) Defendants argue that because Robles had probable cause to arrest St. Martin, he was not obligated to investigate her claims of innocence any further, and therefore there was no

---

[36] St. Martin cites two New Jersey cases laying out the elements for a *common law* malicious prosecution claim. (Pl.'s Br. at 28 (citing *Helmy v. City of Jersey City*, 836 A.2d 802, 804 (N.J. 2003) and *Lind v. Schmid*, 337 A.2d 365, 368 (N.J. 1975)).) Neither case suggests that a malicious prosecution claim brought pursuant to the NJCRA for a violation of the New Jersey constitution can be made out without proving an unconstitutional seizure. *See Allen v. New Jersey State Police*, No. 16-1660, 2017 WL 5714707, at *6 (D.N.J. Nov. 28, 2017) (distinguishing between the elements required for a New Jersey common law malicious prosecution claim, a Section 1983 claim for violation of the federal constitution, and a NJCRA claim for violation of the New Jersey constitution).

constitutional violation. (*Id.* at 32–33.) Summarizing again the facts before Robles at the time he decided to search and then charge St. Martin, Defendants argue that even if he made a mistake of fact or law, the mistakes were "objectively reasonable." (*Id.* at 33–34.) St. Martin responds that factual disputes preclude qualified immunity's application at this stage. (Pl.'s Br. at 39.) She contends that the requirement that an arrest be supported by probable cause is a clearly established right, such that qualified immunity is unavailable. (*Id.*)

The qualified immunity doctrine "shield[s] government officials performing discretionary functions . . . 'from liability from civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Kopec v. Tate*, 361 F.3d 772, 776 (3d Cir. 2004) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The standard "gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Kelly v. Borough of Carlisle*, 622 F.3d 248, 254 (3d Cir. 2010) (quotation marks and citations omitted). Qualified immunity is not a "mere defense to liability" but rather "an entitlement not to stand trial or face the other burdens of litigation." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985); *see also Pearson v. Callahan*, 555 U.S. 223, 231–32 (2009) ("[W]e repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage in litigation." (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991))). A police officer is immune from suit unless the elicited facts viewed in the light most favorable to the plaintiff establish both a violation of a constitutional right and that the right was "clearly established" at the time of the alleged constitutional violation. *Pearson*, 555 U.S. at 232 (discussing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). A police officer seeking the protection of qualified immunity has the burden to establish it on a motion for summary judgment. *Halsey v. Pfeiffer*, 750 F.3d 273, 288 (3d Cir. 2014). The court may determine which prong of the qualified

immunity analysis to address first. *Pearson*, 555 U.S. at 236. The Court will first consider whether the facts viewed in St. Martin's favor establish the violation of a constitutional right, and second whether the right was clearly established.

For the reasons stated above, the Court finds that Robles did not violate St. Martin's constitutional rights because he had probable cause to conduct the search and make the arrest. Viewing the facts in the light most favorable to St. Martin, the Court can identify "no factual questions in dispute dispositive on whether [Robles] lacked probable cause to arrest under an objective reasonableness standard." *Davis*, 451 F. App'x at 233. For this reason alone, Robles is entitled to qualified immunity. *Id.* (finding that officer had probable cause to arrest and thus was entitled to qualified immunity).

However, even if Robles did not have probable cause for the search and arrest, the Court would find that St. Martin's rights were not clearly established. A right is clearly established when "contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Saucier*, 533 U.S. at 202 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). In other words, it must be "clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* The Supreme Court has cautioned against defining a right for purposes of determining whether it is clearly established "at a high level of generality." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011). However, the precise factual circumstances of a given case need not have been previously considered in order for a right to be clearly established. *See Kelly*, 622 F.3d at 259–60.

Here, defining the clearly established right as simply whether or not probable cause is required to support an arrest frames the question at too "high level of generality." *al-Kidd*, 563 U.S. at 742. The definition must account for the fact that St. Martin's argument against probable cause

depends on whether Robles was required to account for CUMMA's affirmative defense and the Guidelines in doing so. As found before, the existence of an affirmative defense under CUMMA did not vitiate probable cause, and the Guidelines' procedures—to the extent Robles did not perfectly follow them—are irrelevant to an officer's probable cause determination. And what is true in determining whether probable cause exists is true in determining whether the right violated was clearly established. *See Wagner v. N. Berks Reg'l Police Dep't*, 816 F. App'x 679, 685 (3d Cir. 2020) (holding that an officer is "entitled to qualified immunity because the law is not clearly established that an officer lacks probable cause where the affirmative defenses of compulsory joinder or Double Jeopardy bars a prosecution"). CUMMA placing burden for proving the affirmative defense on the defendant, and the Guidelines cautioning that an officer may proceed as though the affirmative defense does not apply and that the Guidelines do not create constitutional rights, support this result.[37]

Robles's smell of marijuana created probable cause for the search based on St. Martin's admitted possession of the same. While St. Martin provided proof—which Robles credited—that she was a qualified CUMMA patient, this did not vitiate probable cause because it did not make clear the quantity and source of the marijuana St. Martin possessed. Viewing the facts in the light most favorable to St. Martin, there is no suggestion that during Robles's subsequent investigation, St. Martin was able to provide or Robles was able to uncover information confirming that the marijuana in the four plastic bags was lawfully dispensed. Although there may have been further steps Robles could have taken to confirm the lawfulness of the marijuana, a reasonable official

---

[37] *See* N.J. Stat. Ann. § 2C:35-18(a) (providing that the defendant bears the burden of establishing the CUMMA affirmative defense by a preponderance of the evidence); (Guidelines at 19 (In light of the defendant bearing the burden of proving the affirmative defense, "the officer may in the exercise of his or her discretion proceed as if the affirmative defense does not apply or has not been proved"); *id.* at 1 n.1 ("These Guidelines do not vest enforcement rights in any person claiming noncompliance with or deviation from the policies or recommended practices described herein.").)

would not have understood further steps to be required in order to search or arrest St. Martin. *Hunter*, 502 U.S. at 228–29 (holding that even if probable cause did not exist for an arrest, the officers "nevertheless would be entitled to qualified immunity because their decision was reasonable, even if mistaken"). In short, St. Martin's "exculpatory defense, no matter how compelling, could not defeat this already-present probable cause." *Davis*, 451 F. App'x at 234.[38]

Therefore, summary judgment must be granted to Robles on all claims against him on the additional ground that he is entitled to qualified immunity.

### E.    COUNT FOUR – *MONELL* FAILURE-TO-TRAIN CLAIM

Count Four alleges a section 1983 failure-to-train claim against the Department for deficient training about CUMMA. (FAC ¶¶ 67–72.)[39] The Department first argues for summary judgment in reliance on its other arguments that Robles did not violate St. Martin's constitutional

---

[38] St. Martin argues that Robles' "trusting the information from Det. Van Ness" is fatal to his qualified immunity claim because Van Ness's certification prepared for this matter is "materially deficient." (Pl.'s Br. at 39–40.) However, *United States v. Hensley*, 469 U.S. 221, 230 (1985), which St. Martin relies on, does not bar one officer from relying on another's statements when making a probable cause determination. Here, Robles was not blindly relying on Van Ness's representation that probable cause for an arrest existed, but rather considering information from Van Ness in making Robles's own probable cause determination. *See Ciardiello v. Sexton*, 390 F. App'x 193, 200 (3d Cir. 2010) ("The salient question [to qualified immunity] in this case is thus whether [the arresting officer] knew information, based on either his own observations or [another officer's] statements to him, that would have given [the first officer] an objectively reasonable basis to believe that there was probable cause to arrest."). Further, St. Martin's criticisms of the quality of Van Ness's certification produced for this case overlook the fact that what is relevant in determining probable cause is what information Van Ness relayed to Robles on April 17, 2017. Therefore, St. Martin's criticisms of Van Ness's involvement in Robles's investigation do not change his entitlement to qualified immunity.

[39] The Court initially notes that the West Windsor Township Police Department appears to be an improper defendant to this suit. "In Section 1983 actions, police departments cannot be sued in conjunction with municipalities, because the police department is merely an administrative arm of the local municipality, and is not a separate judicial entity." *Padilla v. Twp. of Cherry Hill*, 110 F. App'x 272, 278 (3d Cir. 2004) (quotations and citation omitted). Courts of this District commonly dismiss civil rights claims against police departments for this reason. *See, e.g., Adams v. City of Camden*, 461 F. Supp. 2d 263, 266 (D.N.J. 2006) (granting summary judgment for police department because it is not a separate entity amenable to suit in a section 1983 action (citing N.J. Stat. Ann. § 40A:14–118)); *McGovern v. City of Jersey City*, No. 98-5186, 2006 WL 42236, at *7 (D.N.J. Jan. 6, 2006) (same). However because the Department does not challenge its inclusion in the instant suit on this basis, the Court turns to the merits of St. Martin's *Monell* claim.

rights, because a plaintiff cannot establish a municipality's liability without showing an underlying constitutional violation. (Defs.' Br. at 26–27.) Further, the Department argues that St. Martin cannot establish a failure-to-train claim because there is no evidence of a pattern of similar incidents that would put the Department on notice that it needed to train its officers on CUMMA. (*Id.* at 28–31.)

St. Martin acknowledges that she can point to no history of issues surrounding CDS law enforcement implicating CUMMA that would put the Department on notice of the need to train its officers on CUMMA's provisions. (Pl.'s Br. at 33.) Nonetheless, she contends that constitutional violations were a "highly predictable consequence" of the Department's failure-to-train its officers about CUMMA. (*Id.*) St. Martin points to language in the Guidelines instructing that they be distributed to all police personnel, as well as language from CUMMA and related policy documents describing the intent of CUMMA to protect qualified patients from arrest for CDS offenses. (*Id.* at 30–32.) St. Martin argues that if Robles had been properly trained, he would have called the ROIC during the traffic stop, rather than the NJMMP, or would have recognized Robles's MMPC from the outset. (*Id.* at 34–35.)

A plaintiff may not hold a municipality liable for the constitutional violations of a police officer through a theory of *respondeat superior. See Monell v. Dept. of Social Services*, 436 U.S. 658, 691 (1978). To establish municipal liability under *Monell*, a plaintiff must instead prove "the existence of a policy or custom that has resulted in a constitutional violation." *Groman*, 47 F.3d at 637 (citing *Monell*, 436 U.S. at 694–95). Even if a municipality's policy or custom is "not unconstitutional itself," *Monell* liability may still be established "when the policy or custom . . . is the 'moving force' behind the constitutional tort of one of [the municipality's] employees." *Colburn v. Upper Darby Twp.*, 946 F.2d 1017, 1027 (3d Cir. 1991) (quoting *Polk Cnty. v. Dodson*,

454 U.S. 312, 326 (1981)). To establish *Monell* liability this way, a plaintiff must "demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 407 (1997) (citing *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989)). "'Deliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (quoting *Bryan Cnty.*, 520 U.S. at 410).

Dismissal of the *Monell* claim is appropriate on several grounds. First, the municipality cannot be liable given the Court's holding that St. Martin has failed to adduce evidence showing that Robles committed a Fourth Amendment offense. *Monell* does not authorize a Section 1983 claim against a municipality "based on the actions of one of its officers when in fact the jury has concluded that the officer inflicted no constitutional harm." *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986). On this basis alone, St. Martin cannot succeed on her theory that the Department is liable for failing to train Robles on CUMMA and the Guidelines. *See Reiff v. Marks*, 511 F. App'x 220, 223 (3d Cir. 2013) ("[A] municipality may not be held liable on a failure-to-train theory when a jury has found that the plaintiff has suffered no constitutional violation."); *Peters v. Brown*, 793 F. App'x 118, 126 (3d Cir. 2019) ("The municipal liability claim . . . fails because there was no underlying constitutional violation by the . . . police defendants.").

Second, St. Martin has not met her burden to adduce evidence, even when viewed in the light most favorable to her, showing deliberate indifference in the Department's training policies. Lacking an unconstitutional policy as written, a plaintiff can establish that a municipality was deliberately indifferent to the known or obvious unconstitutional consequences of its policy and course of training. *See Bryan Cnty.*, 520 U.S. at 404–07. "[W]hen city policymakers are on actual

or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program." *Connick*, 563 U.S. at 61 (citing *Bryan Cnty.*, 520 U.S. at 410). A plaintiff must generally show "knowledge of a prior pattern of similar incidents and circumstances under which the supervisor's actions or inaction could be found to have communicated a message of approval to the offending subordinate." *Montgomery v. De Simone*, 159 F.3d 120, 127 (3d Cir. 1998); *see also Thomas v. Cumberland Cnty.*, 749 F.3d 217, 223 (3d Cir. 2014) ("[A] pattern of similar constitutional violations by untrained employees" is "necessary 'to demonstrate deliberate indifference for purposes of failure to train.'" (quoting *Connick*, 563 U.S. at 62)); *Williams v. Ponik*, 822 F. App'x 108, 111–13 (3d Cir. 2020) (affirming the district court's grant of summary judgment on a *Monell* claim on the municipality's "fail[ure] to train police officers in the use of pepper spray following citizen complaints" because the plaintiff had "failed to connect the past complaints to the present action" and the offending officer had "no prior complaints of excessive force against him").

Nonetheless, without pattern evidence putting a municipality on notice, a plaintiff may still establish deliberate indifference through the "narrow" path of "single-incident liability." *See Thomas*, 749 F.3d at 224 (discussing *City of Canton*, 489 U.S. at 389). To establish liability this way, a plaintiff must show that the need for the policy and training is "'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights." *City of Canton*, 489 U.S. at 389. Liability in single-incident cases depends on "[t]he likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights." *Bryan Cnty.*, 520 U.S. at 409.

St. Martin admits that there is "no prior history of [the Departments'] failure to train," but argues nonetheless that a constitutional violation was a "highly predictable consequence" of the Department's decision not to distribute the Guidelines. (Pl.'s Br. at 33.) When the Department's representative was deposed, he testified that the Department did not provide every new officer with a copy of the Guidelines. (Defs.' SOF ¶ 132; Pl.'s S-SOF ¶ 94.) The Department representative explained that there are many "laws, local ordinances, motor vehicle violations, Attorney General's guidelines, policies, [and] procedures" and that only the "most important" were addressed in new officer training. (Defs.' SOF ¶ 133.) Lt. Mohr testified that he is familiar with investigation and operations reports for officers in the Department and that incidents involving CUMMA "rarely occurred" during his 22 years of service and do not come up frequently during an officer's service. (*Id.* ¶ 134.)

Here, St. Martin has not met her burden to discover evidence that could support single-incident liability. St. Martin offers no evidence regarding the "frequency" of CUMMA's affirmative defense being raised "that could lead to constitutional violations." *Thomas*, 749 F.3d at 225. St. Martin offers no evidence of the number of CUMMA patients in New Jersey at the time Robles stopped Jackson's vehicle, how frequently individuals raised a CUMMA defense in their interactions with police officers across the state, or anything else suggesting the "likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights." *Bryan Cnty.*, 520 U.S. at 409. Lt. Mohr testified that incidents involving CUMMA "rarely occurred," (Defs.' SOF ¶ 134), likewise countermanding St. Martin's claim that a need to train on CUMMA was "obvious." Indeed, Robles and the other

officers at the scene of the traffic stop in 2017 had never seen an MMPC, (Pl.'s C-SOF ¶ 25), which corroborates an absence of a need to train.[40]

Ultimately, St. Martin's deliberate indifference theory appears to rest on the belief that the Department is constitutionally obligated to train its officers on every state law and any Guidelines issued by the Attorney General. St. Martin offers no authority for this position, and indeed, the Supreme Court has cautioned against imposing liability in such situations. In *Connick*, the Court found a theory of single-incident liability untenable based on a prosecutor's office's failure to train prosecutors on *Brady* disclosure obligations. *Connick*, 563 U.S. at 54. The Court held that the plaintiff's "assert[ion] that prosecutors were not trained about particular *Brady* evidence or the specific scenario related to the violation in his case" did not constitute the "sort of nuance" that can "support an inference of deliberate indifference." *Id.* at 67. Section 1983 "does not provide plaintiffs or courts *carte blanche* to micromanage local governments throughout the United States," *id.* at 68, and the Court will not do so here.

Third and finally, St. Martin has failed to show causation in support of *Monell* liability. "Causation is a requirement for failure-to-train liability that is separate from deliberate indifference." *Thomas*, 749 F.3d at 226. The causation analysis focuses "on adequacy of the training program in relation to the tasks the particular officers must perform." *City of Canton*, 489 U.S. at 490. The fact that the municipality *could have* promulgated a different policy is not

---

[40] St. Martin's brief mentions a 2015 report from the Department describing that "possession of illegal substances" offenses "frequently occur" in West Windsor. (Pl.'s Br. at 32.) However, the fact that the Department's officers enforced CDS laws says nothing about the foreseeability they would need to apply CUMMA, which offers an affirmative defense for a specific CDS offense. Likewise, St. Martin's rhetoric that the Department "ignored" the language in CUMMA's legislative findings section that CUMMA may "have the practical effect of protecting from arrest the vast majority of seriously ill people who have a medical need to use cannabis," (*id.* at 31 (quoting N.J. Stat. Ann. § 24:6I-2(b))), or a broad statement from the NJMMP's website that law enforcement would be trained on CUMMA, (*id.* at 32), do not evidence deliberate indifference.

enough to justify *Monell* liability. *Id.* at 392 ("In virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city 'could have done' to prevent the unfortunate incident." (citation omitted)).

St. Martin has failed to explain how training Robles would have avoided the claimed constitutional injury. St. Martin's brief raises only that: (1) Robles would have known to contact the ROIC rather than the NJMMP, and (2) Robles would have recognized the MMPC without needing to run a Google search to look up the card. (Pl.'s Br. at 34.) However, Robles's decision to search the vehicle did not turn on whether he believed St. Martin was a CUMMA patient. Although Robles testified that he had never seen an MMPC before St. Martin's, his comparison of her MMPC to her license and his Google search led him to believe that it was authentic. (Pl.'s S-SOF ¶¶ 179–87.) Further, had Robles called the ROIC instead of the MMPC, the Guidelines explain that the only information he would have obtained was St. Martin's name, date of birth, address, and registry identification number and ATC of any qualifying patient. (Guidelines at 5.) Robles decision to search and issue a complaint against St. Martin turned on his inability to confirm that the four bags of marijuana was lawfully dispensed, not on whether Robles was a CUMMA patient. Therefore, St. Martin offers no argument, let alone evidence, for how training on the Guidelines would have avoided the search and ultimate criminal complaint against her.

Therefore, the Court grants summary judgment for the Department on St. Martin's Section 1983 claim against it.

F.    COUNT FIVE – NEW JERSEY CONSTITUTIONAL VIOLATION

Count Five incorporates the entirety of the Amended Complaint and alleges a separate violation of Article I, Section 7 of the New Jersey Constitution. (FAC ¶¶ 73–76.) Article I, Section 7 of the New Jersey Constitution is almost identical to the language of the Fourth Amendment to

the United States Constitution. *See* N.J. Const. art. I, ¶ 7; U.S. Const. amend. IV. While the Amended Complaint does not say anything more on this claim, St. Martin's brief argues that her malicious prosecution claim is cognizable under state law even if not under federal law. (Pl.'s Br. at 25–28.) St. Martin's brief also argues that the Department can be liable under the state-created danger doctrine under the New Jersey Constitution. (*Id.* at 36.)

The Court grants summary judgment on Count Five. The NJCRA is the state-law analogue to section 1983. *See Perez v. Zagami, LLC*, 94 A.3d 869, 875–77 (N.J. 2014); *see also Chapman v. New Jersey*, No. 08-4130, 2009 WL 2634888, at *3 (D.N.J. Aug. 25, 2009) ("Courts have repeatedly construed the NJCRA in terms nearly identical to its federal counterpart."). Courts in this District routinely grant summary judgment on NJCRA false arrest and imprisonment and malicious prosecution claims on the grounds that the Section 1983 claims have already been dismissed. *See, e.g.*, *Lucia v. Carroll*, No. 12-3787, 2014 WL 1767527, at *3–5 (D.N.J. May 2, 2014) (false arrest and malicious prosecution claims); *Williams v. Vanderud*, No. 16-1245, 2017 WL 4274265, at *12 (D.N.J. Sept. 26, 2017) (false arrest and imprisonment and malicious prosecutions claims). This reasoning compels granting summary judgment on St. Martin's NJCRA claims here as well.[41]

Finally, for the first time in her opposition brief, St. Martin alleges that the Department is liable under the state-created danger doctrine. (Pl.'s Br. at 35.) The Due Process Clause of the United States Constitution "can impose an affirmative duty to protect if the state's own actions create the very danger that causes the plaintiff's injury." *Morrow v. Balaski*, 719 F.3d 160, 167

---

[41] St. Martin argues that there is daylight between the elements to prove state and federal malicious prosecution claims because the state claim does not require showing a "seizure factor." (Pl.'s Br. at 28.) However, the two cases St. Martin cites involve common law malicious prosecution claims, rather than NJCRA claims brought for violations of the state constitution. A review of the Amended Complaint makes clear that St. Martin only leveled malicious prosecution claims under Section 1983 and the NJCRA. (*See generally* FAC.)

(3d Cir. 2013), *as amended* (June 14, 2013); *Gormley v. Wood-El*, 93 A.3d 344, 358 (N.J. 2014) (discussing the state-created danger doctrine arising under the New Jersey Constitution). However, just as St. Martin cannot through her opposition brief add a Fourteenth Amendment procedural due process claim for the confiscation of her marijuana, she cannot raise the state-created danger doctrine for the first time now. *Jones*, 774 F. App'x at 67. Moreover, proving liability through a state-created danger theory requires showing harm that was "foreseeable and fairly direct," that the state actor "acted with a degree of culpability that shocks the conscience," a relationship between the state and the plaintiff "such that the plaintiff was a foreseeable victim of the defendant's acts," and that the state actor exercised authority "in a way that created a danger to the citizen" or made the citizen more vulnerable to danger. *Morrow*, 719 F.3d at 177 (quoting *Bright v. Westmoreland Cnty.*, 443 F.3d 276, 281 (3d Cir. 2006)). None of these elements are evident here. The state-created danger doctrine is an ill-fit for the more garden variety failure-to-train *Monell* theory alleged in the Amended Complaint.

## CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment is **GRANTED**, and judgment for Defendants on all Counts of Plaintiff's Complaint will be entered. An appropriate Order will accompany this Opinion.

_____
**ROBERT KIRSCH**
**UNITED STATES DISTRICT JUDGE**

<u>Dated</u>: October 15, 2024